## UNITED STATES v. HUNT, Governor of Arizona, et al.

District Court, D. Arizona, N. D. May 16, 1927.

1. United States ⊂⇒3—Exercise by United States of power over property owned by it cannot be restricted by laws of state (Const. art. 4, § 3, par. 2, and art. 1, § 8).

Under the provisions of Const. art. 4, § 3, par. 2, and art. 1, § 8, which confer on Congress power to make all needful rules and regulations respecting property belonging to the United States, and to make all laws necessary and proper for carrying such power into execution, the exercise of such powers cannot be restricted by laws of the state in which the property is situated.

2. United States ⊂⇒3—State game laws held inapplicable to killing of surplus deer in national forest and game reserve, under authority of United States (Comp. St. §§ 823, 5121, 5126, 5159 et seq., 5249vv–5249zz; Pen. Code Ariz. 1913, § 654, as amended by Laws 1917, Initiative and Referendum Measure, p. 5).

Regulations of the Department of Agriculture, made under authority of Act March 3, 1891, § 24 (Comp. St. § 5121), Act Feb. 26, 1919 (Comp. St. §§ 5249vv–5249zz), Act Feb. 1, 1905 (Comp. St. § 823), Act June 4, 1897 (Comp. St. § 5126), and Act June 29, 1906 (Comp. St. § 5159 et seq.), authorizing the killing of surplus deer in a national forest and game reserve, where they had so largely increased that there was not sufficient forage for their support and they were starving, and also doing irreparable injury to trees, bushes, and shrubs, may not be interfered with by officers of the state by prosecutions under its game laws (Pen. Code Ariz. 1913, § 654, as amended by Laws 1917, Initiative and Referendum Measure, p. 5), which restrict the killing of deer to a single month in the year by licensed hunters, and limit the number that may be killed by a single person.

3. United States ⊂⇒3—United States held entitled to enjoin interference by state officers with carrying out of regulations respecting national forest and game reserve.

United States held entitled to maintain suit to restrain officers of a state from interfering with the carrying out of regulations relating to a national forest and game reserve.

4. States ⊂⇒4—State cannot make its officers immune from responsibility to supreme authority of United States.

A state has no power to impart to its officers immunity from responsibility to the supreme authority of the United States.

In Equity. Suit by the United States against George W. P. Hunt, Governor of Arizona, and others. Decree for complainant.

John B. Wright, U. S. Atty., of Tucson, Ariz., and R. W. Williams, of Washington, D. C., for the United States.

John W. Murphy, Atty. Gen., of Arizona,

and Earl Anderson, Asst. Atty. Gen., of Arizona, for defendants Hunt and Willard.

Frank Harrison, Co. Atty., of Flagstaff, Ariz., for defendants Parsons and Harrison.

Before ROSS, Circuit Judge, and JAMES and JACOBS, District Judges.

ROSS, Circuit Judge. The purpose of the bill in equity, brought by the government of the United States in this court against the Governor and other officers of the state of Arizona, was and is to procure an injunction prohibiting them and all other persons acting under and by virtue of their authority from in any wise interfering or threatening to interfere with the complainant in its administration of the Kaibab National Forest and the Grand Canyon National Game Preserve, situated in the northerly part of the state of Arizona, by enforcing or threatening to enforce the game laws of that state, in so far as concerns the hunting, killing, or possession of deer or their carcasses on the said lands of the complainant, or the possession, shipment, or transportation of such deer or their carcasses within or without the said state, and that it be decreed that the game laws of the state of Arizona are violative of the Constitution of the United States in so far as they are attempted to be applied to the deer on the above referred to lands of the general government.

The constitutional provisions relied upon by the complainant are paragraph 2 of section 3 of article 4, and paragraph 18 of section 8 of article 1, the first of which reads, "The Congress shall have power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States"; and the second is as follows: "To make all laws which shall be necessary and proper for carrying into execution the foregoing powers * * * vested by this Constitution in the government of the United States, or in any department or officer thereof."

On the 3d of March, 1891, Congress passed an act, section 24 of which authorized the President of the United States to from time to time "set apart and reserve, in any state or territory having public land bearing forests, * * * wholly or in part covered with timber or undergrowth, whether of commercial value or not, as public reservations." Comp. St. § 5121.

The case shows that the number of deer upon the specified lands of the complainant, embracing 722,464 acres, increased from the comparatively small number of about 3,000 or 4,000 to about 30,000 in 1925, according to an estimate of the United States Forest Service, and to such an extent that in years of scant rainfall the feed upon the preserve was so insufficient that large numbers of them died from starvation, and others sustained life only by eating many of the young trees growing upon the lands, and in many instances the twigs and young growth of the old trees, to the serious damage of the property of the complainant.

The evidence shows that, not only do the deer not voluntarily leave the government reservation, but that efforts made by the government and by the state of Arizona to drive them off have proved unsuccessful. It shows beyond question the necessity of reducing the number of deer by some means, and that that fact was recognized both by the complainant and by the state of Arizona. It is apparent, therefore, and from what follows herein, that the present is a wholly different case from any of the large number of cases that have arisen from time to time in the various states between them and individuals in regard to the ownership of wild game within their borders, very many of which cases have been cited by the defendants in the present case and are relied on by their counsel.

In the bill before us the government of the United States alleges, among other things, in substance:

That the boundaries of the forest and of the preserve are substantially the same, the southern boundary of which coincides with the northern boundary of the Grand Canyon National Park, being a line approximately four miles north of the rim of the Grand Canyon of the Colorado river. That the complainant is and has been at all times mentioned in the bill the owner and entitled to the exclusive possession, management, and control of those lands, which were withdrawn by proclamation of the President dated February 20, 1893 (27 Stat. 1064), creating the Grand Canyon Forest Reserve, and continued under reservation as the Kaibab National Forest by his proclamation of July 2, 1908 (35 Stat. 2196). That the said lands were withdrawn by the proclamation of the President November 28, 1906 (34 Stat. 3263), as modified by his proclamation of June 23, 1908 (35 Stat. 2192), and by his proclamation of June 3, 1909 (36 Stat. 2496), and by the Act of Congress of February 26, 1919 (Comp. St. §§ 5249vv–5249zz), and reserved as the Grand Canyon National Game Preserve.

That on the east side of the National Forest there is an open desertlike valley, known as the Houserock Valley, and the Colorado river, and that on the north and northwesterly sides there is a low, open desertlike stretch of country. That on the west side there is a deep box canyon, down which flows Kaibab creek, and that there is a mountain ridge or plateau

running northward and southward through the central part of the forest, which ranges in elevation from about 6,000 to 9,000 feet. That on the easterly and westerly sides of this plateau there is a lower country within the forest, which ranges in elevation down to about 5,500 feet. That the deer upon the National Preserve have been protected by the United States since November 28, 1906, the date of the creation of such reservation, which deer have increased in number so rapidly within the past three years that on certain parts of the lands there is no longer sufficient forage available for their subsistence. That the deer on the said lands are its property, and that they have committed great injury and damage to the said lands of the complainant by overbrowsing and killing the young tree growth, and the shrubs, bushes, and other forage plants upon which they principally subsist, all of which are of great value. That since November, 1924, about 10,000 of them have died because of the fact that there was insufficient forage available for their sustenance, a large part of such loss by death having fallen on the fawns born during the summer of 1924, there now remaining only about 10 per cent. of such 1924 fawns. That the deer, by reason of having become accustomed to living on the said lands of the complainant, both in winter and summer, and by reason of the natural barriers surrounding the said lands of the complainant, do not drift off the said lands, but remain thereon, feeding upon the young trees, shrubs, bushes, and other forage plants upon the lands, and that it is the habit of the said deer to seek the higher elevations on the lands in the spring of each year, as soon as the snow disappears, and remain thereon until the fall, after which they seek the lower elevations to the easterly and westerly sides of the forest and reservation, and remain on such lower elevations until the following spring.

That the complainant has endeavored since October, 1923, to formulate and put into effect plans for the reduction in the number of the said deer in co-operation with the officials of the state of Arizona, which plans were well designed and adapted to effect protection both to the lands of the complainant and to the deer, and that the complainant has by its plans sought to maintain a balance between the number of deer on the lands and the quantity of forage growth available for their use. That on June 4, 1897, Congress passed this act: "The Secretary of the Interior shall make provisions for the protection against destruction by fire and depredations upon the public forests and forest reservations which may have been set aside or which may be hereafter set aside under the said act of March third, eighteen hundred and ninety-one, and which may be continued; and he may make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction; and any violation of the provisions of this act or such rules and regulations shall be punished as is provided for in the act of June fourth, eighteen hundred and eighty-eight, amending section fifty-three hundred and eighty-eight of the Revised Statutes of the United States." Comp. St. § 5126.

That the Act of Congress approved February 1, 1905, provides: "The Secretary of the Department of Agriculture shall, from and after the passage of this act, execute or cause to be executed all laws affecting public lands heretofore or hereafter reserved under the provisions of section twenty-four of the act entitled 'An act to repeal the timber-culture laws, and for other purposes,' approved March third, eighteen hundred and ninety-one, and acts supplemental to and amendatory thereof, after such lands have been so reserved, excepting such laws as affect the surveying, prospecting, locating, appropriating, entering, relinquishing, reconveying, certifying, or patenting of any of such lands." Comp. St. § 823. That by the latter act the complainant is required to protect the timber and undergrowth, regulate the occupancy and use, and preserve the forest on the said national forest and game reserve land from destruction. That the complainant has endeavored to reduce the number of deer on its said lands, to accomplish which purpose it has made use of several different plans. That on November 12, 1924, the complainant gave the game warden of the state of Arizona a permit, pursuant to an application dated November 3, 1924, allowing him to drive 5,000 head of deer, more or less, from the lands of the complainant to the south side of the Grand Canyon of the Colorado river, to do which the game warden employed one McCormick as his agent to do the actual driving of the deer, and that, although a large force of men was employed in that effort, the attempt was unsuccessful. That the complainant has attempted to reduce the number of deer by shipping live deer to other sections of the United States for use in restocking state game preserves and private parks. That a small number, to wit, 397 live deer, were trapped by the complainant on its said lands in 1924 and 1925. That in the fall of 1924, 18 live deer of mature size were trapped, only one of which number could be ship-

ped, and that it died after it reached its destination. That during the summer of 1925 the complainant trapped 379 live deer on its said lands, they being young fawns, which the complainant contracted with ranch owners and others in the vicinity to rear for such time until they would be large enough to be shipped, only a small number of which, to wit, 94, survived and were shipped for restocking purposes of the complainant during the fall of 1925. That the deer on the said lands of the complainant are so numerous that the complainant suffers and has suffered great and irreparable damage by reason thereof, in that the said deer have injured, damaged, and killed young tree growth, shrubs, bushes, and other forage plants of great value, and are continuing to injure, damage, and kill the same. That a large portion of its said acreage has been and is being damaged in that manner. That the amount of forage available for the deer has decreased rapidly within the past two years, and is being decreased, to the detriment of complainant's lands and to the deer thereon, rendering it necessary, in order to correct that situation, that a large number of the deer, to wit, 10,000, be removed as soon as possible from the lands of the complainant. That the complainant, from its said experiences, had reached the conclusion that the most practical method of removal of the surplus deer was the killing of them by hunters, and that therefore the Secretary of the Department of Agriculture, under the authority contained in the acts of Congress approved June 4, 1897, and June 29, 1906 (Comp. St. § 5159 et seq.), promulgated this regulation:

"United States Department of Agriculture

"Office of the Secretary, Washington, D. C.

"Regulation Permitting the Removal of Deer by Killing or Otherwise from the Grand Canyon National Game Preserve or Parts Thereof Whenever Such Removal is Advisable in Order to Prevent an Overstocking Detrimental to the Welfare of the Deer or to Provide Animals for Transfer to Other Areas.

"Investigations having shown that the deer within the Grand Canyon National Game Preserve have increased to such an extent that, in spite of continued heavy reductions in the grazing of live stock, they are overgrazing those classes of forage more palatable for deer to a degree which, if continued, will result in lessening the carrying capacity of the area for deer and the possible defeating of the objects of the game preserve.

"Now, therefore, I, Henry C. Wallace, Secretary of Agriculture, pursuant to authority in me vested by section 2 of the act of Congress approved June twenty-ninth, nineteen hundred six (34 Stat. 607), entitled 'An act for the protection of wild animals in the Grand Canyon Forest Reserve,' do hereby authorize the removal from the Grand Canyon National Game Preserve as established by proclamations of the President of November 28, 1906 (34 Stat. 3263), June 23, 1908 (35 Stat. 2792 [2192]), and June 3, 1909 (36 Stat. 2496), and as amended by Act of February 26, 1919 (40 Stat. 1175), or portions thereof, of such numbers of deer and in such manner and for such purposes as in the opinion of the forester will best serve to preserve conditions favorable to the maintenance of the supply of deer.

"[Signed] Henry C. Wallace,
"Secretary of Agriculture.

"October 2, 1924."

That on November 12, 1924, the forester of the Department of Agriculture, charged with the responsibility of carrying out the orders and regulations of the Secretary of Agriculture relating to the national forests, authorized and directed the district forester of district No. 4 to carry out the regulation of the Secretary, as was his duty under the law. That on November 15, 1924, the district forester began to issue permits to hunters who applied for permits, authorizing them to kill and remove from the lands of the complainant not to exceed three deer per hunter. That on November 21, 1924, the sheriff of Coconino county, Arizona, one William Campbell, arrested three of said hunters, who had previously been authorized by the said district forester to kill and remove the said deer from the said lands of the complainant. That the said Campbell charged the said hunters with violation of paragraph 654, title 18, of the Penal Code, Revised Statutes of Arizona, as amended by Initiative Act approved November 7, 1916, of the Session Laws of that state of 1917 (see page 5), in that the said hunters were in possession of deer outside of the open season for deer prescribed by the laws of the state of Arizona. That the defendants George W. P. Hunt, as Governor of the state of Arizona, G. M. Willard, as game warden of the state of Arizona, Frank Harrison, as county attorney of Coconino county, state of Arizona, and the said William Campbell, as sheriff of Coconino county, state of Arizona, threatened to enforce the laws of the state of Arizona as aforesaid, so far as concerned deer on the said

lands of the complainant, by reason of which threats the said district forester of the United States, on November 21, 1924, discontinued issuing permits to hunters on the said lands of the complainant. That on November 28, 1924, the game warden of Arizona signed the following order permitting the killing of deer on the lands of the complainant during the period December, 1924, to and including January 5, 1925:

"State of Arizona.

"Fish and Game Department, State House, Phœnix, Arizona.

"Whereas, an investigation has been made which shows that mule deer within the Grand Canyon National Game Preserve in Coconino county, Arizona, have increased in numbers to such an extent that serious damage has resulted to the forage and timber on said preserve; and

"Whereas, it has become necessary to reduce the number of deer on said Grand Canyon National Game Preserve in order to protect the forage and timber and provide natural conditions on said preserve favorable to the maintenance of the deer herd:

"Now, therefore, I, G. M. Willard, state game warden of Arizona, acting pursuant to the authority contained in paragraph (b), section 668, of the Revised Statutes of Arizona, as amended by chapter 169, Session Laws of Arizona 1919, hereby allow and permit the killing of mule deer during the period December 1, 1924–January 5, 1925, inclusive, on that portion of the Grand Canyon National Game Preserve lying west of the Ryan-Dry Park road.

"[Signed] G. M. Willard,
"State Game Warden.

"Phœnix, Arizona, November 28, 1924."

That on November 28, 1924, the game warden of the state entered into the following agreement with the United States district forester:

"Memorandum of agreement between R. H. Rutledge, district forester, U. S. Forest Service, and G. M. Willard, state game warden for the state of Arizona, relative to conditions under which deer may be killed on the Grand Canyon National Game Preserve:

"This agreement, dated November 28, 1924, made at Phœnix, Arizona, by and between G. M. Willard, state game warden of Arizona, party of the first part, and R. H. Rutledge, district forester, District U. S. Forest Supervisor, party of the second part: In consideration of the mutual benefits to the party of the first part and the party of the second part which will accrue under the terms of this agreement, it is hereby understood and agreed that:

"1. The hunters on the Grand Canyon National Game Preserve shall be issued permits by the U. S. Forest Service under the direction of the party of the second part, to be numbered serially, each permit to provide for the killing and removal of one deer from the Grand Canyon Game Preserve.

"2. Not more than three permits for the killing and removal of deer from the Grand Canyon National Game Preserve shall be issued to any one person.

"3. $1.25 shall be forwarded to the state game department, state of Arizona, out of each $5.00 permit fee collected by the Forest Service.

"4. The U. S. Forest Service is to supervise the killing and removal of deer from the Grand Canyon National Game Preserve, without cost to the state of Arizona.

"5. The records of the U. S. Forest Service relative to issuance of permits shall be kept open to the inspection of the party of the first part or his representative.

"[Signed] G. M. Willard,
"State Game Warden.
"[Signed] R. H. Rutledge,
"District Forester, Dist. 4."

That during the summer of 1925 the said United States district forester informed the game warden of the state of the necessity for removing a number of the deer from the lands of the complainant as a measure of protection to the deer herd itself, and also as a measure of protection to the valuable young trees, shrubs, bushes, and other forage plants upon the said lands, and that thereupon the said game warden signed another order and agreement, similar to that last referred to. That on September 17, 1925, the defendant Governor of the state signed and promulgated this executive order:

"Executive Order.

"To Honorable G. M. Willard, State Game Warden, the Public of Arizona, Nonresidents of Arizona:

"My attention has been directed to the proposal of the Forest Service to open the Kaibab Game Preserve for hunting.

"The state of Arizona asserts its ownership in all the wild animals and birds in the state of Arizona except those that are retained under legal permit from the state game de-

partment for zoological purposes, pets, etc. We specifically claim ownership for the state of Arizona in the deer on the Kaibab Game Preserve, but, due to the fact that those deer range on forest lands and have been protected by executive order of the President of the United States, and the fact that it is the program of the Forest Service that the deer herd be reduced for their own protection and the protection of the forest, the state game department will co-operate in the regulation and supervision of the taking of those deer, with the definite understanding that all the laws of the state of Arizona for the protection and conservation of game animals be observed, including license fees, bag limit, and that the deer be taken within the season fixed by the initiative measure adopted by the people of Arizona as found on page 5 of the initiative and referendum sections of the Session Laws of Arizona, 1917.

"[Signed] Geo. W. P. Hunt.
"Governor of Arizona.
"September 17, 1925."

That, as soon as the said Governor had signed and issued the foregoing order, the game warden of the said state canceled, revoked, and abrogated his preceding order and agreement, and refused and has continued to refuse to allow or permit deer to be killed or possessed on the lands of the complainant, except in accordance with the laws of the state, as referred to in the foregoing executive order of its Governor, dated September 17, 1925, and that the defendant officers of the state and their successors in office have likewise so refused and continue to refuse to allow and permit deer to be killed or possessed on the lands of the said complainant, except in accordance with the game laws of that state. That the restrictions on the hunting, killing, and possession of deer made by the laws of the state, which permit only one male deer with horns to be taken by each hunter, confine the hunting of deer to the month of October, prohibit the transportation or shipment of dead deer out of the state, require a nonresident of the state to pay a license fee of $20 for the right to kill one deer, combined with the fact that the said lands of the complainant are inaccessible to the larger part of the hunters of Arizona, resulted in only about 366 deer being killed and removed from the lands of the complainant during the month of October, 1925, and that on October 24th of that year the Secretary of the United States Department of Agriculture, acting under and by virtue of the authority hereinbefore referred to, promulgated this regulation:

"United States Department of Agriculture

"Office of the Secretary, Washington, D. C.

"Regulation Permitting the Killing of Deer on Grand Canyon National Game Preserve by Employees of and Persons Co-operating with the Department of Agriculture.

"Whereas, it has been determined that the deer on the Grand Canyon National Game Preserve, in the Kaibab National Forest, established under authority of the Act of June 29, 1906 (34 Stat. 607), by proclamation of the President on November 28, 1906 (34 Stat. 3263), as modified by proclamations of the President on June 23, 1908 (35 Stat. 2192), and June 3, 1909 (36 Stat. 2496), and by the Act of February 26, 1919 (40 Stat. 1178), have increased to such an extent that they have caused and are causing serious damage and injury to the range and timber on said game preserve and national forest, and have reduced and are reducing the forage for the deer on said game preserve to such an extent that starvation of the deer is imminent; and

"Whereas, reduction in the number of the deer on said game preserve is essential to the protection of the aforesaid property of the United States and to the perpetuation of the deer in numbers consistent with the forage capacity of the range; and

"Whereas, the capture and shipping of live deer for restocking other areas and for scientific and other purposes, and the opening up of the game preserve to hunting under the restrictive provisions of the laws of the state of Arizona, have been resorted to as a means of relief and have been found to be wholly inadequate:

"Now, therefore, I, William M. Jardine, Secretary of Agriculture, pursuant to the authority in me vested by the Act of February 1, 1905 (33 Stat. 628), amendatory of the Act of June 4, 1897 (30 Stat. 11), and section 2 of the said Act of June 29, 1906 (34 Stat. 607), do hereby authorize and direct employees of the Department of Agriculture and persons co-operating with said department to remove deer from said Grand Canyon National Game Preserve, in such manner and number and under such conditions as the forester shall find to be necessary for the protection and preservation of said property of the United States and the forage capacity of the preserve for deer. Deer captured or killed under this regulation shall be disposed of in such manner and for such purposes as the forester shall find to be practicable.

"In witness whereof, I have hereunto set my hand this 24th day of October, 1925.

"W. M. Jardine,

"[Seal]    Secretary of Agriculture.

That on November 4, 1925, the forester of the United States Department of Agriculture authorized and directed the district forester to make such reduction in the number of deer on the said lands of the complainant as was in his judgment necessary to protect the remaining deer from loss by starvation and to protect the valuable growth of young trees, shrubs, bushes, and other forage plants upon the said lands. That the defendants have interfered and threaten that they will continue to interfere with the carrying out of the orders of the said Secretary of Agriculture and forester, and that they threaten that they will arrest and prosecute, or cause to be arrested and prosecuted, any person or persons who may kill or possess deer on the said lands of the complainant, or who may possess, transport, or ship such deer off of the said lands after having killed or possessed them thereon, claiming that the laws of the state regarding such game are of superior force and effect to the laws of the United States and the regulations of its officers.

The evidence shows that in the years 1922 and 1923 an investigation made by the forest officials disclosed the very rapid increase in the number of the deer and the damage being done thereby to the trees and other growth on the lands of the complainant, and that previous to such investigation and discovery the game warden of the state of Arizona had reported to those officials that in his opinion it was necessary to reduce the number of the deer in order to prevent further damage to the trees and growth upon the government property; that on the 1st of October, 1923, the forest official conferred with the Governor of the state regarding the matter, who promised to make a personal investigation of it in the near future, and did so with the state game warden within a few days thereafter; that in the latter part of the next month the forest officer received a letter from the state warden, stating that he thought the Governor had become thoroughly convinced of the necessity of removing the surplus deer from the government reserve; that the next spring the Secretary of the United States Department of Agriculture and the government forester procured several nationally known game associations and other organizations interested in game conservation to make an examination of the lands of the reserve and of the deer, and to report the result of such investigations; that

a committee appointed by them for that purpose spent ten days in August, 1924, in making the requested investigations, after which it reported in substance that the following steps should be taken:

"First. Trap and ship live deer to other localities, to be used for restocking purposes.

"Second. That an effort be made to drive the deer off the preserves to the adjoining country for restocking purposes.

"Third. If the first two methods fail to accomplish the needed reduction, that the preserve be open to hunting by sportsmen under regulations to be prescribed by the Secretary of Agriculture.

"Fourth. If all the above measures prove inadequate, that government officers kill as many deer as was necessary to accomplish the desired end, utilizing the meat and hides to the best advantage possible."

The record shows that the Secretary of Agriculture issued on October 24, 1925, a regulation authorizing and directing employees of the department and persons co-operating with the said Department of Agriculture to remove deer from the Kaibab Forest and Reserve in any such manner and number as the forester should find to be necessary for the protection and preservation of the forage and deer thereon, and that the forester of the department authorized and directed the district forester to put that regulation into effect.

The record shows that, in carrying those regulations into effect, three nonresident sportsmen, acting under the authority of the United States, killed certain deer upon the premises of the complainant and were actually arrested by authority of the state of Arizona, on the ground that they thereby violated the game laws of the state, who threatened to continue such arrests and prosecutions for other and further acts of a similar nature.

[1, 2] The evidence shows conclusively that the deer confine themselves to the government's reservation (with the possible exception of a few stragglers from time to time), and move from place to place in herds. Whether they be the personal property of the United States, as contended by the complainant, or the property of the state of Arizona, for the benefit of its people, as claimed by the defendants, we do not find it necessary to decide, for in either event we think there can be no doubt of the right of the government of the United States to do whatever is necessary for it to do upon its own property to protect it from the depredations complained of, including the killing or removal of whatever number of the deer as may be necessary, without any regard to the game laws of the state of

Arizona. The defendants concede the right of the complainant to kill any particular deer found eating or damaging any particular tree or otherwise injuring the growth upon the property of the complainant. To limit such right to those particular instances would, in our opinion, be a violation of plain common sense, as the fact is shown beyond dispute that the deer move from place to place upon the property in large herds.

The clause of the Constitution that has already been cited in express terms confers upon Congress "the power to dispose of and make all needful rules and regulations respecting the territory or other property belonging to the United States." No one questions, or could, as a matter of course, question, the ownership by the government of all the lands embraced within the boundaries of the Kaibab National Forest and the Grand Canyon National Game Preserve in the state of Arizona. Being owner of the land, it, as a necessary consequence, owns every tree, without regard to age or size, and all growth of every character constituting part and parcel of the land. As such owner, the government is legally and justly entitled to protect the entire property of every kind and character, and by means and methods of its own selection exercised through its own agents; this not to include the licensing of hunters to transport deer killed on the reserve to places outside the same in violation of the game laws of Arizona.

There remains to dispose of the contentions on the part of defendants to the effect that the case does not present a controversy calling for the exercise of judicial power, and that the suit cannot be maintained because it is in reality and legal effect a suit against the state.

[3] Respecting the first of these contentions, it appears that, when the United States government adopted its plan to rid its lands of the injury and damage thereon by the surplus deer by means of nonresident sportsmen, the latter were actually arrested by the officers of the state, on the ground that their acts constituted a violation of the game laws of Arizona, and that similar arrests and prosecutions were threatened by the defendants. Injunction was, in our opinion, not only the appropriate and proper, but the only legal, remedy the government had. The principle governing the case is, we think, clearly illustrated by the Supreme Court of the United States in the case of Missouri v. Holland, 252 U. S. 416, 40 S. Ct. 382, 64 L. Ed. 641, 11 A. L. R. 984. That was a bill in equity brought by the state of Missouri to prevent a game warden of the United States from attempting to enforce the Migratory Bird Treaty Act of July 3, 1918 (40 Stat. 755; Comp. St. §§ 8837a–8837m), and the regulations made by the Secretary of Agriculture in pursuance thereof, and the court held, among other things, that the protection of a quasi sovereign right of the state to regulate the taking of game is a sufficient jurisdictional basis, apart from any pecuniary interest it might have, for a bill by a state to enjoin enforcement of federal regulations over the subject alleged to be unconstitutional.

The same thing is, of course, true respecting the right of the sovereign government of the United States to maintain a suit in equity against the state for a like purpose.

[4] Regarding the claim on the part of the defendants that the complainant cannot maintain the suit against them as officers of the state, it is, we think, enough to cite the decision of the Supreme Court in the case of Ex parte Young, 209 U. S. 123, 28 S. Ct. 441, 52 L. Ed. 714, 13 L. R. A. (N. S.) 932, 14 Ann. Cas. 764, where, among other things, it was held that the attempt of a state officer to enforce an unconstitutional statute is a proceeding without authority of, and does not affect, the state in its sovereign or governmental capacity, and is an illegal act, and that the officer is stripped of his official character and is subjected in his person to the consequences of his individual conduct, and further that the state has no power to impart to its officer immunity from responsibility to the supreme authority of the United States.

It results from what has been said that the complainant in the present case is entitled to equitable relief in accordance with the views above expressed, and a decree to that effect will be entered. Counsel for the complainant will prepare such a decree, present it to the counsel for the defendants, and thereafter to the judges.