564 P.2d 615

**MIMBRES VALLEY IRRIGATION CO., Plaintiff-Appellee,**

v.

**Tony SALOPEK et al., Defendants-Appellees,**

v.

**DEPARTMENT OF AGRICULTURE FOREST SERVICE, Defendant-Appellant,**

**State of New Mexico, Plaintiff-in-Intervention-Appellee.**

**No. 11094.**

Supreme Court of New Mexico.

May 23, 1977.

Victor Ortega, U. S. Atty., James B. Grant, Asst. U. S. Atty., Albuquerque, Peter R. Steenland, Jr., Land & Natural Resources Div., Dept. of Justice, Washington, D. C., for defendant-appellant.

Toney Anaya, Atty. Gen., Paul L. Bloom, Richard A. Simms, Asst. Attys. Gen., Santa Fe, for State of New Mexico, intervenor.

J. Wayne Woodbury, Ben Shantz, Silver City, for appellees.

## OPINION

PAYNE, Justice.

This suit was filed in 1966 as a private action to enjoin alleged illegal diversions of the Rio Mimbres which flows through the Gila National Forest in southwest New Mexico. In 1970 the State of New Mexico, on the relation of the State Engineer and pursuant to § 75–4–4, N.M.S.A.1953 (Repl. Vol. 11, Pt. 2, 1968), filed a complaint-in-intervention seeking a general adjudication of water rights in the Rio Mimbres and its tributaries. The complaint-in-intervention named as defendants all parties claiming any interest in and use of the waters of the Rio Mimbres. The State's motion to intervene was granted and the suit proceeded as a general statutory adjudication of all the water rights on the stream system.

Among the named defendants in the complaint-in-intervention was the United States of America, joined pursuant to 43 U.S.C. § 666 (1970). The United States claimed reserved water rights for minimum

instream flows and for recreational purposes within the Gila National Forest. The matter was referred by the trial court to a special master to determine the rights of the parties. The master entered findings of fact and conclusions of law which supported the United States' claim to 6.0 cubic feet per second of water in the Gila National Forest for minimum instream flows and recreational purposes. The State of New Mexico, pursuant to N.M.R.Civ.P. 53(e)(2)[1], objected to the master's report. The district court reversed, holding that the United States had not reserved water rights in the Gila National Forest for its claimed purposes. We affirm the decision of the district court.

The "reservation" doctrine, as it applies to federal enclaves, was initially recognized in *Winters, v. United States*, 207 U.S. 564, 28 S.Ct. 207, 52 L.Ed. 340 (1908). The issue decided therein was whether the United States, at the time of the creation of the Fort Belknap Indian Reservation in Montana, had impliedly reserved a water right for future use of the Indians upon those lands. The United States Supreme Court upheld the power of the federal government to reserve the waters and exempt them from appropriation under state laws.

The exact meaning of the principle articulated in the *Winters* case has been subject to inconclusive debate through the years. It was further clarified, however, in *Arizona v. California*, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542 (1963), a case that also involved waters flowing through the Gila National Forest. The United States Supreme Court reaffirmed the viability of the *Winters* doctrine, and for the first time extended the reservation doctrine to other non-Indian federal enclaves. Although it refused to discuss the non-Indian related claims, the Court said:

> The Master ruled that the principle underlying the reservation of water rights for Indian Reservations was equally ap-

plicable to other federal establishments such as National Recreation Areas and National Forests. We agree with the conclusions of the Master that the United States intended to reserve water sufficient for the future requirements of the Lake Mead National Recreation Area, the Havasu Lake National Wildlife Refuge, the Imperial National Wildlife Refuge and the Gila National Forest.

373 U.S. at 601, 83 S.Ct. at 1498.

More recently the Supreme Court has given additional guidance on the application of the principle of reserved water rights. In *Cappaert v. United States*, 426 U.S. 128, 96 S.Ct. 2062, 48 L.Ed.2d 523 (1976), the Court stated:

> [W]hen the Federal Government reserves land, by implication it reserves the water rights sufficient to accomplish the purposes of the reservation.
>
> In determining whether there is a federally reserved water right implicit in a federal reservation of public land, the issue is whether the Government intended to reserve unappropriated and thus available water. Intent is inferred if the previously unappropriated waters are necessary to accomplish the purposes for which the reservation was created. . . . (Citations omitted.)

426 U.S. at 139, 96 S.Ct. at 2070.

> The implied-reservation-of-water doctrine, however, reserves only that amount of water necessary to fulfill the purpose of the reservation, no more. . . . (Citation omitted.)

Id. at 141, 96 S.Ct. at 2071.

The *Cappaert* decision restricts the application of the reservation doctrine to the limited purposes for which the reservation was created.

The final decree entered in *Arizona v. California*[2] concludes that the United States had reserved water rights in "quantities reasonably necessary to fulfill the

---

1. Section 21–1–1(53)(e)(2), N.M.S.A.1953 (Repl.Vol. 4, 1970).

2. 376 U.S. 340, 350, 84 S.Ct. 755, 11 L.Ed.2d 757 (1964). Decree carrying into effect the

United States Supreme Court's prior opinion of June 3, 1963, 373 U.S. 546, 83 S.Ct. 1468, 10 L.Ed.2d 542.

purposes of the Gila National Forest." Applying the *Cappaert* Rule, we must now determine for what purpose the Gila National Forest was originally established and whether those purposes necessarily require an implied reservation of water.

The Gila National Forest was established by separate presidential proclamations dated March 2, 1899, July 2, 1905, February 6, 1907, June 18, 1908 and May 9, 1910. In subsequent years portions of other national forests were transferred to the Gila National Forest so that it now comprises about 2,787,093 acres of land in southwestern New Mexico. Approximately 92,622 acres of privately owned land is encompassed by the forest. The legislative act under which the establishment of national forests was authorized is the Creative Act of March 3, 1891. 16 U.S.C. § 471 (1970). It reads as follows:

> The President of the United States may, from time to time, set apart and reserve, in any State or Territory having public land bearing forests, in any part of the public lands wholly or in part covered with timber or undergrowth, whether of commercial value or not, as national forests, and the President shall, by public proclamation, declare the establishment of such forests and the limits thereof.

The statute did not set forth the purposes for which the forests were withdrawn nor did it set up the means of administration of the forests. Further congressional action to remedy this situation resulted in the passage of the Organic Act of 1897. 16 U.S.C. § 475 (1970); see Bassman, "The 1897 Organic Act: A Historical Perspective," 7 Nat.Res.Law. 503 (1974). The pertinent provision of that Act reads as follows:

> § 475. *Purposes For Which National Forests May Be Established And Administered.*
>
> . . . No national forest shall be established, except to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use

and necessities of citizens of the United States; but it is not the purpose or intent of these provisions, or of said section, to authorize the inclusion therein of lands more valuable for the mineral therein, or for agricultural purposes, than for forest purposes.

The Act limits the purposes for which national forests are authorized to: 1) improving and protecting the forest, 2) securing favorable conditions of water flows, and 3) furnishing a continuous supply of timber.

The United States asserts that additional recreational purposes were envisioned when the act was passed. It likewise argues that minimum instream flows are necessary for aesthetic, environmental, recreational and "fish" purposes. We do not disagree with the objective of preserving the aesthetic and environmentally pleasing qualities of the forests and we appreciate the availability of the forests for recreational purposes. We cannot agree, however, that these objectives come within the original intent of Congress when creating national forests. The United States would equate these other "uses" of the forest as part of the original "purposes" for which it was established, and argues that the "uses" and "purposes" of the forest are one and the same. Congress has provided that the Secretary of Agriculture is authorized "to regulate . . . occupancy and use and to preserve the forests thereon from destruction . . . 16 U.S.C. § 551 (1970). We are urged to recognize this section of the Code as support for the proposition that the words "occupancy and use" contemplate more than the limited purposes set out in the Organic Act. We cannot take such liberty with the expressions of Congress. There is little doubt that if secondary uses such as grazing, mining or recreation conflict with the primary purposes of assuring watershed protection or timber preservation, those secondary uses would not be permitted to continue. *United States v. Grimaud*, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563 (1911); *Light v. United States*, 220 U.S. 523, 31 S.Ct. 485, 55 L.Ed. 570 (1911); *United States v. Hunt*, 19 F.2d 634 (N.D.Ariz.1927); *Honchok v. Hardin*, 326

F.Supp. 988 (D.Md.1971). The fact that Congress has opened the national forests for the many diversified uses which are now allowed does not expand the purposes for which they were originally created.

If there remains any question concerning the applicability of the "reservation" doctrine for the uses now claimed by the United States, it is dispelled by the Multiple-Use Sustained-Yield Act of 1960. 16 U.S.C. § 528 (1970). This act includes the following proviso:

It is the policy of the Congress that national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes. The purposes of sections 528 to 531 of this title are declared to be supplemental to, but not in derogation of, the purposes for which the national forests were established as set forth in section 475 of this title.

The United States argues that this enactment by Congress clarifies and is further support for its position that these additional purposes have always been considered as integral parts of the whole purpose of the Creative and Organic Acts. A similar argument was made in *West Virginia Div. of Izaak Walton L. of Am., Inc. v. Butz*, 522 F.2d 945 (4th Cir. 1975), wherein the Court stated:

In effect, appellants appear to argue that the Multiple-Use Act has by implication repealed the restrictive provisions of the Organic Act. In our opinion, however, this argument falls short of the mark on several grounds. First of all, it is at odds with the well established rule that repeal of a statute by implication is not favored and, as recently stated by the Court in *Morton v. Mancari*, 417 U.S. 535, 550, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974):

"In the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable."

In addition to the foregoing principle, Section 1 of the Multiple-Use Act specifi-

cally recognizes the continued viability of the Organic Act in the following language:

"The purposes of this Act are declared to be supplemental to, but not in derogation of, the purposes for which the national forests were established as set forth in the Act of June 4, 1897 (16 U.S.C. § 475)."

Appellants' argument in this respect also elides the fact that in and out of Congress there has not been unanimous agreement with respect to the interpretation and application of the Multiple-Use Act. Over a decade after its passage controversy over its meaning and intent, as well as the management practices of the Forest Service, . . . has continued unabated.

.     .     .     .     .

[F]rom our review of the material at hand we are satisfied that in enacting this legislation Congress did not intent [sic] to jettison or repeal the Organic Act of 1897. We are equally satisfied that this act did not constitute a ratification of the relatively new policy of the Forest Service   .   .   .

522 F.2d at 953–54.

The Multiple-Use Sustained-Yield Act can just as easily be interpreted to exclude the additional purposes as part of the original intent of the Organic Act. The fact that Congress declared them to be "supplemental to" the purposes for which the national forests were established clearly indicates that Congress did not envision them as having been included in the original Act. The Multiple-Use Sustained-Yield Act of 1960 does not have a retroactive effect nor can it broaden the purposes for which the Gila National Forest was established under the Organic Act of 1897.

We thus conclude that the original purposes for which the Gila National Forest was created were to insure favorable conditions of water flow and to furnish a continuous supply of timber. Recreational purposes and minimum instream flows were not contemplated.

We are aware of the advancing environmental and aesthetic concerns related to the use of our natural resources. Had the congressional enactments and their interpretations by the Supreme Court given us leeway so as to interpret more broadly the intent of the Creative and Organic Acts we may have been persuaded to decide differently. However, the intent of Congress is clear and we must follow it.

An additional matter raised in this appeal is whether the water rights used by permittees of the United States Forest Service should be adjudicated to the permittee under the state law of prior appropriation or outright to the United States. The prior discussion in this opinion reveals that the United States does not have reserved water rights in the forests for these permitted uses. It necessarily follows that water rights must be perfected and held by the permittee in accordance with state law.

We affirm the trial court.

IT IS SO ORDERED.

SOSA and EASLEY, JJ., concur.