# UNITED STATES *v.* NEW MEXICO

No. 77–510.   Argued April 24, 25, 1978—Decided July 3, 1978

REHNQUIST, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, and STEVENS, JJ., joined. POWELL, J., filed an opinion dissenting in part, in which BRENNAN, WHITE, and MARSHALL, JJ., joined, *post,* p. 718.

*Assistant Attorney General Moorman* argued the cause for the United States. With him on the briefs were *Solicitor General McCree, Deputy Solicitor General Barnett, Peter R. Steenland,* and *Dirk D. Snel.*

*Richard A. Simms,* Special Assistant Attorney General of New Mexico, argued the cause for respondent. With him on the brief were *Toney Anaya,* Attorney General, *Peter Thomas White,* and *Don Klein,* Special Assistant Attorneys General.

*John Undem Carlson* argued the cause for the Twin Lakes Reservoir and Canal Co. et al. as *amici curiae* urging affirm-

ance. With him on the brief were *Alan E. Boles, Jr., Charles M. Elliott,* and *Charles J. Beise.**

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

The Rio Mimbres rises in the southwestern highlands of New Mexico and flows generally southward, finally disappearing in a desert sink just north of the Mexican border. The river originates in the upper reaches of the Gila National Forest, but during its course it winds more than 50 miles past privately owned lands and provides substantial water for both irrigation and mining. In 1970, a stream adjudication was begun by the State of New Mexico to determine the exact rights of each user to water from the Rio Mimbres.[1] In this

---

*A brief of *amici curiae* urging affirmance was filed by *Ralph Hunsaker* for the Arizona Water Commission, and for their respective States by *Evelle J. Younger,* Attorney General of California; *Robert B. Hansen,* Attorney General of Utah; *Michael T. Greely,* Attorney General of Montana; *Wayne L. Kidwell,* Attorney General of Idaho, and *Josephine Beeman,* Assistant Attorney General; *Slade Gorton,* Attorney General of Washington, and *Charles B. Roe, Jr.,* Senior Assistant Attorney General; *Robert F. List,* Attorney General of Nevada, and *Harry W. Swainston,* Deputy Attorney General; *James A. Redden,* Attorney General of Oregon, and *Clarence R. Kruger,* Assistant Attorney General; *J. D. MacFarlane,* Attorney General of Colorado, and *David W. Robbins,* Deputy Attorney General; *V. Frank Mendicino,* Attorney General of Wyoming, and *Jack D. Palma II,* Assistant Attorney General. Briefs of *amici curiae* urging affirmance were also filed by *Gary J. Greenberg* for Molycorp, Inc.; by *J. Wayne Woodbury* for Phelps Dodge Corp.; and by *M. Byron Lewis* and *Neil Vincent Wake* for the Salt River Project Agricultural Improvement and Power District.

[1] The suit was initially filed in 1966 as a private action by the Mimbres Valley Irrigation Co. to enjoin alleged illegal diversions from the Rio Mimbres. In 1970, the State of New Mexico, pursuant to New Mexico Stat. Ann. § 75–4–4 (1953), filed a complaint-in-intervention seeking a general adjudication of water rights in the Rio Mimbres and its tributaries. Under 43 U. S. C. § 666 (a), "[c]onsent is given to join the United States as a defendant in any suit . . . for the adjudication of rights to the use of water of a river system or other source," including the reserved rights

adjudication the United States claimed reserved water rights for use in the Gila National Forest. The State District Court held that the United States, in setting aside the Gila National Forest from other public lands, reserved the use of such water "as may be necessary for the purposes for which [the land was] withdrawn," but that these purposes did not include recreation, aesthetics, wildlife preservation, or cattle grazing. The United States appealed unsuccessfully to the Supreme Court of New Mexico. *Mimbres Valley Irrigation Co.* v. *Salopek,* 90 N. M. 410, 564 P. 2d 615 (1977). We granted certiorari to consider whether the Supreme Court of New Mexico had applied the correct principles of federal law in determining petitioner's reserved rights in the Mimbres. 434 U. S. 1008. We now affirm.

I

The question posed in this case—what quantity of water, if any, the United States reserved out of the Rio Mimbres when it set aside the Gila National Forest in 1899—is a question of implied intent and not power. In *California* v. *United States, ante,* at 653–663, we had occasion to discuss the respective authority of Federal and State Governments over waters in the Western States.[2] The Court has previously concluded that whatever powers the States acquired over their waters as a result of congressional Acts and admission into the Union, however, Congress did not intend thereby to relinquish its authority to reserve unappropriated water in the future for use on appurtenant lands withdrawn from the public domain for specific federal purposes. *Winters* v. *United States,* 207 U. S. 564, 577 (1908); *Arizona* v. *California,* 373 U. S. 546, 597–598 (1963); *Cappaert* v. *United States,* 426 U. S. 128, 143–146 (1976).

---

of the United States. See *United States* v. *District Court for Eagle County,* 401 U. S. 520 (1971); *United States* v. *District Court for Water Div. No. 5,* 401 U. S. 527 (1971).

[2] See also *Andrus* v. *Charlestone Stone Products Co.,* 436 U. S. 604 (1978).

Recognition of Congress' power to reserve water for land which is itself set apart from the public domain, however, does not answer the question of the amount of water which has been reserved or the purposes for which the water may be used. Substantial portions of the public domain *have* been withdrawn and reserved by the United States for use as Indian reservations, forest reserves, national parks, and national monuments. And water is frequently necessary to achieve the purposes for which these reservations are made. But Congress has seldom expressly reserved water for use on these withdrawn lands. If water were abundant, Congress' silence would pose no problem. In the arid parts of the West, however, claims to water for use on federal reservations inescapably vie with other public and private claims for the limited quantities to be found in the rivers and streams. This competition is compounded by the sheer quantity of reserved lands in the Western States, which lands form brightly colored swaths across the maps of these States.[3]

The Court has previously concluded that Congress, in giving

---

[3] The percentage of federally owned land (*excluding* Indian reservations and other trust properties) in the Western States ranges from 29.5% of the land in the State of Washington to 86.5% of the land in the State of Nevada, an average of about 46%. Of the land in the State of New Mexico, 33.6% is federally owned. General Services Administration, Inventory Report on Real Property Owned by the United States Throughout the World as of June 30, 1974, pp. 17, 34, and App. 1, table 4. Because federal reservations are normally found in the uplands of the Western States rather than the flatlands, the percentage of water flow originating in or flowing through the reservations is even more impressive. More than 60% of the average annual water yield in the 11 Western States is from federal reservations. The percentages of average annual water yield range from a low of 56% in the Columbia-North Pacific water-resource region to a high of 96% in the Upper Colorado region. In the Rio Grande water-resource region, where the Rio Mimbres lies, 77% of the average runoff originates on federal reservations. C. Wheatley, C. Corker, T. Stetson, & D. Reed, Study of the Development, Management and Use of Water Resources on the Public Lands 402–406, and table 4 (1969).

the President the power to reserve portions of the federal domain for specific federal purposes, *impliedly* authorized him to reserve "appurtenant water then unappropriated *to the extent needed to accomplish the purpose of the reservation."* *Cappaert, supra,* at 138 (emphasis added). See *Arizona* v. *California, supra,* at 595–601; *United States* v. *District Court for Eagle County,* 401 U. S. 520, 522–523 (1971); *Colorado River Water Cons. Dist.* v. *United States,* 424 U. S. 800, 805 (1976). While many of the contours of what has come to be called the "implied-reservation-of-water doctrine" remain unspecified, the Court has repeatedly emphasized that Congress reserved "only that amount of water necessary to fulfill the purpose of the reservation, no more." *Cappaert, supra,* at 141. See *Arizona* v. *California, supra,* at 600–601; *District Court for Eagle County, supra,* at 523. Each time this Court has applied the "implied-reservation-of-water doctrine," it has carefully examined both the asserted water right and the specific purposes for which the land was reserved, and concluded that without the water the purposes of the reservation would be entirely defeated.[4]

---

[4] In *Winters* v. *United States,* 207 U. S. 564 (1908), the Court was faced with two questions. First, whether Congress, when it created the Fort Belknap Indian Reservation by treaty, impliedly guaranteed the Indians a reasonable quantity of water. And second, whether Congress repealed this reservation of water when it admitted Montana to the Union one year later "upon an equal footing with the original States." In answering the first question, the Court emphasized that the reservation was formed to change the Indians' "nomadic and uncivilized" habits and to make them into "a pastoral and civilized people." *Id.,* at 576. Without water to irrigate the lands, however, the Fort Belknap Reservation would be "practically valueless" and "civilized communities could not be established thereon." *Ibid.* The purpose of the Reservation would thus be "impair[ed] or defeat[ed]." *Id.,* at 577. In answering the second question, the Court concluded that "it would be extreme to believe that within a year Congress destroyed the reservation and took from the Indians the consideration of their grant, leaving them a barren waste—took from them

This careful examination is required both because the reservation is implied, rather than expressed, and because of the history of congressional intent in the field of federal-state

the means of continuing their old habits, yet did not leave them the power to change to new ones." *Ibid.*

In *Arizona* v. *California,* the Court only had reason to discuss the Master's finding that the United States had reserved water for use on Arizona Indian reservations. Arizona argued that there was "a lack of evidence showing that the United States in establishing the reservations intended to reserve water for them." 373 U. S., at 598. The Court disagreed:

"It is impossible to believe that when Congress created the great Colorado River Indian Reservation and when the Executive Department of this Nation created the other reservations they were unaware that most of the lands were of the desert kind—hot, scorching sands—and that water from the river would be essential to the life of the Indian people and to the animals they hunted and the crops they raised." *Id.,* at 598–599.

The Court also pointed to congressional debate that indicated that Congress had intended to reserve the water for the reservations. *Id.,* at 599.

In *Cappaert,* Congress had given the President the power to reserve "objects of historic or scientific interest that are situated upon the lands owned or controlled by the Government." American Antiquities Preservation Act, 34 Stat. 225, 16 U. S. C. § 431 *et seq.* (1976 ed.). Pursuant to this power, the President had reserved Devil's Hole as a national monument. Devil's Hole, according to the Presidential Proclamation, is " 'a unique subsurface remnant of the prehistoric chain of lakes which in Pleistocene times formed the Death Valley Lake System' "; it also contains " 'a peculiar race of desert fish, and zoologists have demonstrated that this race of fish, which is found nowhere else in the world, evolved only after the gradual drying up of the Death Valley Lake System isolated this fish population from the original ancestral stock that in Pleistocene times was common to the entire region.' " 426 U. S., at 132. As the Court concluded, the pool was reserved specifically to preserve its scientific interest, principal of which was the Devil's Hole pupfish. Without a certain quantity of water, these fish would not be able to spawn and would die. This quantity of water was therefore impliedly reserved when the monument was proclaimed. *Id.,* at 141. The Court, however, went on to note that the pool "need only be preserved, consistent with the intention expressed in the Proclamation, to the extent necessary to preserve its scientific interest. . . . The District Court thus tailored its injunction, very appro-

jurisdiction with respect to allocation of water. Where Congress has expressly addressed the question of whether federal entities must abide by state water law, it has almost invariably deferred to the state law.[5] See *California v. United States, ante,* at 653–670, 678–679. Where water is necessary to fulfill the very purposes for which a federal reservation was created, it is reasonable to conclude, even in the face of Congress' express deference to state water law in other areas, that the United States intended to reserve the necessary water. Where water is only valuable for a secondary use of the reservation, however, there arises the contrary inference that Congress intended, consistent with its other views, that the United States would acquire water in the same manner as any other public or private appropriator.

Congress indeed has appropriated funds for the acquisition under state law of water to be used on federal reservations. Thus, in the National Park Service Act of Aug. 7, 1946, 60 Stat. 885, as amended, 16 U. S. C. § 17j–2 (1976 ed.), Congress authorized appropriations for the "[i]nvestigation and establishment of water rights *in accordance with local custom, laws, and decisions of courts,* including the acquisition of water rights or of lands or interests in lands or rights-of-way for use and protection of water rights necessary or beneficial in the

---

priately, to *minimal need,* curtailing pumping only to the extent necessary to preserve an adequate water level at Devil's Hole, thus implementing the stated objectives of the Proclamation." *Ibid.* (emphasis added).

[5] See Hearings on S. 1275 before the Subcommittee on Irrigation and Reclamation of the Senate Committee on Interior and Insular Affairs, 88th Cong., 2d Sess., 302–310 (1964) (App. B, supplementary material submitted by Sen. Kuchel), listing 37 statutes in which Congress has expressly recognized the importance of deferring to state water law, from the Mining Act of 1866, § 9, 14 Stat. 253, to the Act of Aug. 28, 1958, § 202, 72 Stat. 1059, stating Congress' policy to "recognize and protect the rights and interests of the State of Texas in determining the development of the watersheds of the rivers . . . and its interests and rights in water utilization and control."

administration and public use of the national parks and monuments." (Emphasis added.) [6] The agencies responsible for administering the federal reservations have also recognized Congress' intent to acquire under state law any water not essential to the specific purposes of the reservation.[7]

The State District Court referred the issues in this case to a Special Master, who found that the United States was diverting 6.9 acre-feet per annum of water for domestic-residential use, 6.5 acre-feet for road-water use, 3.23 acre-feet for domestic-recreational use, and .10 acre-foot for "wildlife" purposes.[8] The Special Master also found that specified

---

[6] See also the Department of Agriculture Organic Act of 1944, 58 Stat. 737, 16 U. S. C. § 526 (1976 ed.), authorizing the appropriation of funds "for the investigation and establishment of water rights, including the purchase thereof or of lands or interests in land or rights-of-way for use and protection of water rights necessary or beneficial in connection with the administration and public use of the national forests."

[7] Before this Court's decisions in *FPC* v. *Oregon,* 349 U. S. 435 (1955) and *Arizona* v. *California,* recognizing reserved rights outside of Indian reservations, the Forest Service apparently believed that all of its water had to be obtained under state law. "Rights to the use of water for National Forest purposes will be obtained in accordance with State law." Forest Service Manual (1936). While the Forest Service has apparently modified its policy since those decisions, their Service Manual still indicates a policy of deferring to state water law wherever possible. "The right of the States to appropriate and otherwise control the use of water is recognized, and the policy of the Forest Service is to abide by applicable State laws and regulations relating to water use. When water is needed by the Forest Service either for development of programs, improvements, or other uses, action will be taken promptly to acquire necessary water rights. . . ." Forest Service Handbook § 2514 (Feb. 1960). "The rights to use water for national forest purposes will be obtained in accordance with State law. This policy is based on the act of June 4, 1897 (16 U. S. C. [§] 481)." Forest Service Manual § 2514.1 (Jan. 1960).

[8] The District Court of Luna County, in its finding of facts, did not list any current water use for "wildlife" purposes. App. 226–227. The United States apparently did not object to this deletion in state court nor does it challenge the deletion in its brief before this Court.

amounts of water were being used in the Gila National Forest for stockwatering and that an "instream flow" of six cubic feet per second was being "used" for the purposes of fish preservation. The Special Master apparently believed that all of these uses fell within the reservation doctrine, and also concluded that the United States might have reserved rights for future water needs, ordering it to submit a report on future requirements within one year of his decision.

The District Court of Luna County disagreed with many of the Special Master's legal conclusions, but agreed with the Special Master that the Government should prepare within one year a report covering any future water requirements that might support a claim of reserved right in the waters of the Rio Mimbres. The District Court concluded that the United States had not established a reserved right to a minimum instream flow for any of the purposes for which the Gila National Forest was established, and that any water rights arising from cattle grazing by permittees on the forest should be adjudicated "to the permittee under the law of prior appropriation and not to the United States."

The United States appealed this decision to the Supreme Court of New Mexico. The United States contended that it was entitled to a minimum instream flow for "aesthetic, environmental, recreational and 'fish' purposes." 90 N. M., at 412, 564 P. 2d, at 617. The Supreme Court of New Mexico concluded that, at least before the Multiple-Use Sustained-Yield Act of 1960, 74 Stat. 215, 16 U. S. C. § 528 *et seq.* (1976 ed.), national forests could only be created "to insure favorable conditions of water flow and to furnish a continuous supply of timber" and not for the purposes upon which the United States was now basing its asserted reserved rights in a minimum instream flow. 90 N. M., at 412–413, 564 P. 2d, at 617–619. The United States also argued that it was entitled to a reserved right for stockwatering purposes. The State Supreme Court again disagreed, holding that stockwatering

was not a purpose for which the national forests were created. *Id.*, at 414, 564 P. 2d, at 619.

## II

### A

The quantification of reserved water rights for the national forests is of critical importance to the West, where, as noted earlier, water is scarce and where more than 50% of the available water either originates in or flows through national forests.[9]  When, as in the case of the Rio Mimbres, a river is fully appropriated, federal reserved water rights will frequently require a gallon-for-gallon reduction in the amount of water available for water-needy state and private appropriators. This reality has not escaped the attention of Congress and must be weighed in determining what, if any, water Congress reserved for use in the national forests.

The United States contends that Congress intended to reserve minimum instream flows for aesthetic, recreational, and fish-preservation purposes.  An examination of the limited purposes for which Congress authorized the creation of national forests, however, provides no support for this claim.  In the mid and late 1800's, many of the forests on the public domain were ravaged and the fear arose that the forest lands might soon disappear, leaving the United States with a shortage both of timber and of watersheds with which to encourage stream flows while preventing floods.[10]  It was in answer to these fears that in 1891 Congress authorized the President to "set apart and reserve, in any State or Territory having public land bearing forests, in any part of the public lands wholly or in part covered with timber or undergrowth, whether of commercial value or not, as public reservations." Creative Act of Mar. 3, 1891, § 24, 26 Stat. 1103, as amended, 16 U. S. C. § 471 (repealed 1976).

---

[9] Wheatley, Corker, Stetson & Reed, *supra* n. 3, at 211.

[10] J. Ise, The United States Forest Policy 62–118 (1972).

The Creative Act of 1891 unfortunately did not solve the forest problems of the expanding Nation. To the dismay of the conservationists, the new national forests were not adequately attended and regulated; fires and indiscriminate timber cutting continued their toll.[11] To the anguish of Western settlers, reservations were frequently made indiscriminately. President Cleveland, in particular, responded to pleas of conservationists for greater protective measures by reserving some 21 million acres of "generally settled" forest land on February 22, 1897.[12] President Cleveland's action drew immediate and strong protest from Western Congressmen who felt that the "hasty and ill considered" reservation might prove disastrous to the settlers living on or near these lands.[13]

Congress' answer to these continuing problems was three-fold. It suspended the President's Executive Order of February 22, 1897; it carefully defined the purposes for which national forests could in the future be reserved; and it provided a charter for forest management and economic uses within the forests. Organic Administration Act of June 4, 1897, 30 Stat. 34, 16 U. S. C. § 473 *et seq.* (1976 ed.). In particular, Congress provided:

> *"No national forest shall be established, except to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use*

---

[11] *Id.,* at 120–122.

[12] *Id.,* at 129. President Cleveland's action more than doubled the acreage of then-existing United States forest reserves. Cf. *id.,* at 120.

[13] *Id.,* at 130–139. Western Congressmen had objected since 1891 to what they viewed to be frequently indiscriminate creation of federal forest reserves. *Id.,* at 129–130. A major complaint of the Western Congressmen was that rampant reserving of forest lands by the United States might leave "no opportunity there for further enlargement of civilization by the establishment of agriculture or mining." 30 Cong. Rec. 1281 (1897) (Sen. Cannon).

*and necessities of citizens of the United States;* but it is not the purpose or intent of these provisions, or of [the Creative Act of 1891], to authorize the inclusion therein of lands more valuable for the mineral therein, or for agricultural purposes, than for forest purposes." 30 Stat. 35, as codified, 16 U. S. C. § 475 (1976 ed.) (emphasis added).

The legislative debates surrounding the Organic Administration Act of 1897 and its predecessor bills demonstrate that Congress intended national forests to be reserved for only two purposes—"[t]o conserve the water flows, and to furnish a continuous supply of timber for the people." [14] 30 Cong. Rec.

---

[14] The Government notes that the Act forbids the establishment of national forests except *"to improve and protect the forest within the boundaries, or* for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber," and argues from this wording that "improvement" and "protection" of the forests form a third and separate purpose of the national forest system. A close examination of the language of the Act, however, reveals that Congress only intended national forests to be established for two purposes. Forests would be created only "to improve and protect the forest within the boundaries," or, *in other words,* "for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber."

This reading of the Act is confirmed by its legislative history. Nothing in the legislative history suggests that Congress intended national forests to be established for three purposes, one of which would be extremely broad. Indeed, it is inconceivable that a Congress which was primarily concerned with limiting the President's power to reserve the forest lands of the West would provide for the creation of forests merely "to improve and protect the forest within the boundaries"; forests would be reserved for their improvement and protection, but only to serve the purposes of timber protection and favorable water supply.

This construction is revealed by a predecessor bill to the 1897 Act which was introduced but not passed in the 54th Congress; the 1896 bill provided: "That the object for which public forest reservations shall be established under the provisions of the act approved March 3, 1891, shall be to protect and improve the forests *for the purpose of* securing a continuous

967 (1897) (Cong. McRae). See *United States* v. *Grimaud*, 220 U. S. 506, 515 (1911). National forests were not to be reserved for aesthetic, environmental, recreational, or wildlife-preservation purposes.[15]

"The objects for which the forest reservations should be made are the protection of the forest growth against destruction by fire and ax, and preservation of forest conditions upon which water conditions and water flow are dependent. The purpose, therefore, of this bill is to maintain favorable forest conditions, without excluding the use of these reservations for other purposes. They are not parks set aside for nonuse, but have been established for economic reasons." 30 Cong. Rec. 966 (1897) (Cong. McRae).

Administrative regulations at the turn of the century confirmed that national forests were to be reserved for only these two limited purposes.[16]

---

supply of timber for the people and securing conditions favorable to water flow." H. R. 119, 54th Cong., 1st Sess. (1896) (emphasis added).

Earlier bills, like the 1897 Act, were less clear and could be read as setting forth either two or three purposes. Explanations of the bills by their congressional sponsors, however, clearly revealed that national forests would be established for only two purposes. Compare, for example, H. R. 119, 53d Cong., 1st Sess. (1893) ("[N]o public forest reservations shall be established except to improve and protect the forest within the reservation or for the purpose of securing favorable conditions of water flow and continuous supplies of timber to the people") with its sponsor's description of the bill, 25 Cong. Rec. 2375 (1893) (Cong. McRae) ("The bill authorizes the President to establish forest reservations, and to protect the forests 'for the purpose of securing favorable conditions of water flow and continuous supplies of timber to the people' ").

[15] See 30 Cong. Rec. 986 (1897) (Cong. Bell); *id.*, at 987 (Cong. Jones); H. R. Rep. No. 1593, 54th Cong., 1st Sess., 3 (1896); 25 Cong. Rec. 2435 (1893) (Cong. McRae); H. R. Rep. No. 2437, 52d Cong., 2d Sess., 2 (1893); S. Rep. No. 1002, 52d Cong., 1st Sess., 10, 12 (1892).

[16] According to the 1901 Regulations of the Interior Department, "Public forest reservations are established to protect and improve the forests for

Any doubt as to the relatively narrow purposes for which national forests were to be reserved is removed by comparing the broader language Congress used to authorize the establishment of national parks.[17] In 1916, Congress created the National Park Service and provided that the

> "fundamental purpose of the said parks, monuments, and reservations . . . is to conserve the scenery and the natural and historic objects and the wild life therein and to provide for the enjoyment of the same . . . unimpaired for the enjoyment of future generations." National Park Service Act of 1916, 39 Stat. 535, § 1, as amended, 16 U. S. C. § 1 (1976 ed.).[18]

---

the purpose of securing a permanent supply of timber for the people and insuring conditions favorable to continuous water flow." Department of Interior Circular, 30 L. D. 23, 24 (1900). Twelve years later, the Chief Forester also elaborated on the purposes of the national forests: "The National Forests are set aside specifically for the protection of water resources and the production of timber . . . . The aim of administration is essentially different from that of a national park, in which economic use of material resources comes second to the preservation of natural conditions on aesthetic grounds." U. S. Department of Agriculture, Report of the Forester 10–11 (1913).

[17] As Congressman McRae noted in introducing a predecessor bill to the 1897 Act, Congress was "not dealing with parks, but forest reservations, and there is a vast difference." 25 Cong. Rec. 2375 (1893).

[18] While in 1906 Congress transferred jurisdiction of the national forests to the Department of Agriculture, Transfer Act of 1905, 33 Stat. 628, national parks are exclusively under the jurisdiction of the Department of the Interior. This difference in jurisdiction again points up the limited purposes of the national forests, as explained in the House Report on the National Park Service Act:

"It was the unanimous opinion of the committee that there should not be any conflict of jurisdiction as between the departments [of the Interior and Agriculture] of such a nature as might interfere with the organization and operation of the national parks, which are set apart for the public enjoyment and entertainment, as against those reservations specifically created for the conservation of the natural resources of timber and other

When it was Congress' intent to maintain minimum instream flows within the confines of a national forest, it expressly so directed, as it did in the case of the Lake Superior National Forest:

> "In order to preserve the shore lines, rapids, waterfalls, beaches and other natural features of the region in an unmodified state of nature, no further alteration of the natural water level of any lake or stream . . . shall be authorized." 16 U. S. C. § 577b (1976 ed.).

National park legislation is not the only instructive comparison. In the Act of Mar. 10, 1934, 48 Stat. 400, 16 U. S. C. § 694 (1976 ed.), Congress authorized the establishment within individual national forests of fish and game sanctuaries, *but only with the consent of the state legislatures.* The Act specifically provided:

> "For the purpose of providing breeding places for game birds, game animals, and fish on lands and waters in the national forests not chiefly suitable for agriculture, the President of the United States is authorized, upon recommendation of the Secretary of Agriculture and the Secretary of Commerce *and with the approval of the State legislatures of the respective States in which said national forests are situated,* to establish by public proclamation certain specified and limited areas within said forests as fish and game sanctuaries or refuges which shall

---

national assets, and devoted strictly to utilitarian purposes, in the vastly greater areas, known as national forests.

"The segregation of national-park areas necessarily involves the question of the preservation of nature as it exists, and the enjoyment of park privileges requires the development of adequate and moderate-priced transportation and hotel facilities. In the national forests there must always be kept in mind as primary objects and purposes the utilitarian use of land, of water, and of timber, as contributing to the wealth of all the people." H. R. Rep. No. 700, 64th Cong., 1st Sess., 3 (1916).

be devoted to the increase of game birds, game animals, and fish of all kinds naturally adapted thereto." (Emphasis added.)

If, as the dissent contends, *post,* at 722, Congress in the Organic Administration Act of 1897 authorized the reservation of forests to "improve and protect" fish and wildlife, the 1934 Act would have been unnecessary. Nor is the dissent's position consistent with Congress' concern in 1934 that fish and wildlife preserves only be created "with the approval of the State legislatures."

As the dissent notes, in creating what would ultimately become Yosemite National Park, Congress in 1890 explicitly instructed the Secretary of the Interior to provide against the wanton destruction of fish and game inside the forest and against their taking "for the purposes of merchandise or profit." Act of Oct. 1, 1890, § 2, 26 Stat. 651. Congress also instructed the Secretary to protect all "the natural curiosities, or wonders within such reservation, . . . in their natural condition." By comparison, Congress in the 1897 Organic Act expressed no concern for the preservation of fish and wildlife within national forests generally. Nor is such a concern found in any of the comments made during the legislative debate on the 1897 Act. Cf. also H. R. 119, 54th Cong., 1st Sess., 28 Cong. Rec. 6410 (1896).[19]

**B**

Not only is the Government's claim that Congress intended to reserve water for recreation and wildlife preservation inconsistent with Congress' failure to recognize these goals as purposes of the national forests, it would defeat the very

---

[19] In comparing the 1897 Organic Act with enabling legislation for national parks and particular national forests, and with the Act of Mar. 10, 1934, we of course do not intimate any views as to what, if any, water Congress reserved under the latter statutes.

purpose for which Congress did create the national forest system.[20]

> "[F]orests exert a most important regulating influence upon the flow of rivers, reducing floods and increasing the water supply in the low stages. The importance of their conservation on the mountainous watersheds which collect the scanty supply for the arid regions of North America can hardly be overstated. With the natural regimen of the streams replaced by destructive floods in the spring, and by dry beds in the months when the irrigating flow is most needed, the irrigation of wide areas now proposed will be impossible, and regions now supporting prosperous communities will become depopulated." S. Doc. No. 105, 55th Cong., 1st Sess., 10 (1897).

The water that would be "insured" by preservation of the forest was to "be used for domestic, mining, milling, or irrigation purposes, under the laws of the State wherein such national forests are situated, or under the laws of the United States and the rules and regulations established thereunder." Organic Administration Act of 1897, 30 Stat. 36, 16 U. S. C.

---

[20] It was the view of several of the Congressmen who spoke on the floor of the House that national forests were necessary "not to save the timber for future use so much as to preserve the water supply." 30 Cong. Rec. 1007 (1897) (Cong. Ellis). See also id., at 1399 (Cong. Loud).

Congress has assured that the waters which flow through national forests are available for use by state appropriators by authorizing rights-of-way for ditches to carry the water to agricultural, domestic, mining, and milling uses. See Right-of-Way Permit Act of 1891, 43 U. S. C. § 946 et seq.; Right-of-Way Permit Act of 1901, 43 U. S. C. § 959; Forest Right-of-Way Act of 1905, 16 U. S. C. § 524 (repealed in part 1976). Congress has evidenced its continuing concern with enhancing the water supply for nonforest use by specifically authorizing the President to set aside and protect national forest lands needed as sources of municipal water supplies. Act of May 28, 1940, 54 Stat. 224, 16 U. S. C. § 552a (1976 ed.). See also Act of June 7, 1924, 16 U. S. C. § 570 (1976 ed.) (authorizing the purchase of private lands for inclusion in national forests where needed to protect "streams used for navigation or for irrigation").

§ 481 (1976 ed.). As this provision and its legislative history evidence, Congress authorized the national forest system principally as a means of enhancing the quantity of water that would be available to the settlers of the arid West. The Government, however, would have us now believe that Congress intended to partially defeat this goal by reserving significant amounts of water for purposes quite inconsistent with this goal.

## C

In 1960, Congress passed the Multiple-Use Sustained-Yield Act of 1960, 74 Stat. 215, 16 U. S. C. § 528 *et seq.* (1976 ed.), which provides:

"It is the policy of Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes. The purposes of sections 528 to 531 of this title are declared to be supplemental to, but not in derogation of, the purposes for which the national forests were established as set forth in the [Organic Administration Act of 1897.]"

The Supreme Court of New Mexico concluded that this Act did not give rise to any reserved rights not previously authorized in the Organic Administration Act of 1897. "The Multiple-Use Sustained-Yield Act of 1960 does not have a retroactive effect nor can it broaden the purposes for which the Gila National Forest was established under the Organic Act of 1897." 90 N. M., at 413, 564 P. 2d, at 618. While we conclude that the Multiple-Use Sustained-Yield Act of 1960 was intended to broaden the purposes for which national forests had previously been administered, we agree that Congress did not intend to thereby expand the reserved rights of the United States.[21]

---

[21] The United States does not argue that the Multiple-Use Sustained-Yield Act of 1960 reserved additional water for use on the national forests. Instead, the Government argues that the Act confirms that Congress *always*

The Multiple-Use Sustained-Yield Act of 1960 establishes the purposes for which the national forests *"are* established and *shall* be administered." (Emphasis added.) The Act directs the Secretary of Agriculture to administer all forests, including those previously established, on a multiple-use and sustained-yield basis. H. R. 10572, 86th Cong., 2d Sess., 1 (1960). In the administration of the national forests, therefore, Congress intended the Multiple-Use Sustained-Yield Act of 1960 to broaden the benefits accruing from all reserved national forests.

The House Report accompanying the 1960 legislation, however, indicates that recreation, range, and "fish" purposes are "to be supplemental to, but not in derogation of, the purposes for which the national forests were established" in the Organic Administration Act of 1897.

> "The addition of the sentence to follow the first sentence in section 1 is to make it clear that the declaration of congressional policy that the national forests are established and shall be administered for the purposes enumerated is supplemental to, but is not in derogation of, the purposes of improving and protecting the forest or for securing favorable conditions of water flows and to furnish a continuous supply of timber as set out in the

---

foresaw broad purposes for the national forests and authorized the Secretary of the Interior as early as 1897 to reserve water for recreational, aesthetic, and wildlife-preservation uses. Brief for United States 53–56. As the legislative history of the 1960 Act demonstrates, however, Congress believed that the 1897 Organic Administration Act only authorized the creation of national forests for two purposes—timber preservation and enhancement of water supply—and intended, through the 1960 Act, to *expand* the purposes for which the national forests should be administered. See, *e. g.,* H. R. Rep. No. 1551, 86th Cong., 2d Sess., 4 (1960).

Even if the 1960 Act expanded the reserved water rights of the United States, of course, the rights would be subordinate to any appropriation of water under state law dating to before 1960.

cited provision of the act of June 4, 1897. Thus, in any establishment of a national forest a purpose set out in the 1897 act must be present but there may also exist one or more of the additional purposes listed in the bill. In other words, a national forest could not be established just for the purpose of outdoor recreation, range, or wildlife and fish purposes, but such purposes could be a reason for the establishment of the forest if there also were one or more of the purposes of improving and protecting the forest, securing favorable conditions of water flows, or to furnish a continuous supply of timber as set out in the 1897 act." H. R. Rep. No. 1551, 86th Cong., 2d Sess., 4 (1960).

As discussed earlier, the "reserved rights doctrine" is a doctrine built on implication and is an exception to Congress' explicit deference to state water law in other areas. Without legislative history to the contrary, we are led to conclude that Congress did not intend in enacting the Multiple-Use Sustained-Yield Act of 1960 to reserve water for the *secondary* purposes there established.[22] A reservation of additional water could mean a substantial loss in the amount of water available for irrigation and domestic use, thereby defeating Congress' principal purpose of securing favorable conditions of water flow. Congress intended the national forests to be administered for broader purposes after 1960 but there is no indication that it believed the new purposes to be so crucial as to require a reservation of additional water. By reaffirming the primacy of a favorable water flow, it indicated the opposite intent.

## III

What we have said also answers the Government's contention that Congress intended to reserve water from the Rio

---

[22] We intimate no view as to whether Congress, in the 1960 Act, authorized the subsequent reservation of national forests out of public lands to which a broader doctrine of reserved water rights might apply.

Mimbres for stockwatering purposes. The United States issues permits to private cattle owners to graze their stock on the Gila National Forest and provides for stockwatering at various locations along the Rio Mimbres. The United States contends that, since Congress clearly foresaw stockwatering on national forests, reserved rights must be recognized for this purpose. The New Mexico courts disagreed and held that any stockwatering rights must be allocated under state law to individual stockwaterers. We agree.

While Congress intended the national forests to be put to a variety of uses, including stockwatering, not inconsistent with the two principal purposes of the forests, stockwatering was not itself a direct purpose of reserving the land.[23] If stockwatering could not take place in the Gila National Forest, Congress' purposes in reserving the land would not be defeated. Congress, of course, did intend to secure favorable water flows, and one of the uses to which the enhanced water supply was intended to be placed was probably stockwatering. But Congress intended the water supply from the Rio Mimbres to

---

[23] As discussed earlier, the national forests were not to be "set aside for non-use," 30 Cong. Rec. 966 (1897) (Cong. McRae), but instead to be opened up for any economic use not inconsistent with the forests' primary purposes. *Ibid.* One use that Congress foresaw was "pasturage." *Ibid.* See also *id.,* at 1006 (Cong. Ellis); *id.,* at 1011 (Cong. De Vries). As this Court has previously recognized, however, grazing was merely one use to which the national forests could possibly be put and would not be permitted where it might interfere with the specific purposes of the national forests including the securing of favorable conditions of water flow. Under the 1891 and 1897 forest Acts, "any use of the reservation for grazing or other lawful purpose was required to be subject to the rules and regulations established by the Secretary of Agriculture. To pasture sheep and cattle on the reservation, at will and without restraint, might interfere seriously with the accomplishment of the purposes for which they were established. But a limited and regulated use for pasturage might not be inconsistent with the object sought to be attained by the statute." *United States* v. *Grimaud,* 220 U. S. 506, 515–516 (1911). See also *Light* v. *United States,* 220 U. S. 523 (1911).

be allocated among private appropriators under state law. 16 U. S. C. § 481 (1976 ed.).[24] There is no indication in the legislative histories of any of the forest Acts that Congress foresaw any need for the Forest Service to allocate water for stockwatering purposes, a task to which state law was well suited.

---

[24] As noted earlier, the Organic Administration Act of 1897 specifically provided: "All waters within the boundaries of national forests may be used for domestic, mining, milling, or irrigation purposes, under the laws of the State wherein such national forests are situated, *or under the laws of the United States and the rules and regulations established thereunder.*" 30 Stat. 36, as amended, 16 U. S. C. § 481 (1976 ed.) (emphasis added). The United States, seizing on the italicized wording, contends that Congress intended the United States to allocate water to certain private users—in this case, cattle ranchers—outside of the structure of state water law. Contemporaneous Acts of Congress, however, preclude this construction of § 481.

In the same Act in which Congress first authorized the national forest system, Act of Mar. 3, 1891, § 18, 26 Stat. 1101, Congress provided for rights-of-way through the "public lands and *reservations*" for purposes of irrigation, *"Provided,* That no such right of way shall be so located as to interfere with the proper occupation by the Government of any such reservation, . . . and *the privilege herein granted shall not be construed to interfere with the control of water for irrigation and other purposes under authority of the respective States or Territories."* (Emphasis added.) Contemporaneous administrative regulations reflected that the "control of the flow and use of the water" on federal reservations was "a matter exclusively under State or Territorial control." Department of Interior Circular, 18 L. D. 168, 169–170 (1894). See also *H. H. Sinclair,* 18 L. D. 573, 574 (1894). Only a few months before Congress passed the Organic Administration Act of 1897, Congress reaffirmed the state-law policy of the 1891 Act. In the Act of Feb. 26, 1897, ch. 335, 29 Stat. 599, Congress authorized the improvement and occupation of reservoir sites on public lands, *"Provided,* That the charges for water coming in whole or part from reservoir sites used or occupied under the provisions of this Act shall always be subject to the control and regulation of the respective States and Territories in which such reservoirs are in whole or part situate." As we noted in *California* v. *United States, ante,* at 661, it "was clearly the opinion of a majority of the Congressmen who spoke on the bill . . . that [this proviso] was unnecessary except out of an excess of cau-

## IV

Congress intended that water would be reserved only where necessary to preserve the timber or to secure favorable water flows for private and public uses under state law. This intent is revealed in the purposes for which the national forest system was created and Congress' principled deference to state water law in the Organic Administration Act of 1897 and other legislation. The decision of the Supreme Court of New Mexico is faithful to this congressional intent and is therefore

*Affirmed.*

MR. JUSTICE POWELL, with whom MR. JUSTICE BRENNAN, MR. JUSTICE WHITE, and MR. JUSTICE MARSHALL join, dissenting in part.

I agree with the Court that the implied-reservation doctrine should be applied with sensitivity to its impact upon those who have obtained water rights under state law and to Congress' general policy of deference to state water law. See *ante,* at 699, 701–702, 705. I also agree that the Organic Administration Act of 1897, 30 Stat. 11, cannot fairly be read as evidencing an intent to reserve water for recreational or stock-watering purposes in the national forests.[1]

_____

tion." It was their belief that, at least under the 1891 Act, the States had exclusive control of the distribution of water on public lands and reservations. *Ante,* at 661–662, and n. 16.

Contemporaneous administrative regulations of the officials responsible for administering the national forests confirm that the States were to have control of the distribution of water from streams flowing through the forests. In 1908, for example, the Forest Service began a policy of charging for the use of water, based upon the length of ditches, acreage flooded, and use of advantageous locations, but emphasized that the "water itself is granted by the State, not by the United States." 1906 Report of the Forester to the Secretary of Agriculture, H. R. Doc. No. 6, 59th Cong., 2d Sess., p. 273 (1907).

[1] I express no view as to the effect of the Multiple-Use Sustained-Yield Act of 1960, 74 Stat. 215, 16 U. S. C. § 528 *et seq.* (1976 ed.), on the

I do not agree, however, that the forests which Congress intended to "improve and protect" are the still, silent, lifeless places envisioned by the Court.  In my view, the forests consist of the birds, animals, and fish—the wildlife—that inhabit them, as well as the trees, flowers, shrubs, and grasses. I therefore would hold that the United States is entitled to so much water as is necessary to sustain the wildlife of the forests, as well as the plants.  I also add a word concerning the impact of the Court's holding today on future claims by the United States that the reservation of particular national forests impliedly reserved instream flows.

---

United States' reserved water rights in national forests that were established either before or after that Act's passage.  Although the Court purports to hold that passage of the 1960 Act did not have the effect of reserving any additional water in then-existing forests, see *ante*, at 713–715, this portion of its opinion appears to be dicta.  As the Court concedes, "[t]he United States does not argue that the Multiple-Use Sustained-Yield Act of 1960 reserved additional water for use on the national forests."  *Ante*, at 713 n. 21.  Likewise, the State argues only that "[n]o reserved rights for fish or wildlife can be implied in the Gila National Forest *prior to the enactment of the Multiple-Use Sustained-Yield Act of June 12, 1960 . . . ."* Brief for Respondent 44 (emphasis supplied); see also *id.*, at 1 ("questions presented").  Indeed, the State has gone so far as to suggest that passage of the 1960 Act may well have expanded the United States' reserved water rights in the national forests, presumably with a priority date for the additional reserved rights of 1960.  See Brief in Opposition 16–17.  Read in context, the New Mexico Supreme Court's statement that the 1960 Act "does not have a retroactive effect nor can it broaden the purposes for which the Gila National Forest was established under the Organic Act of 1897," *Mimbres Valley Irrigation Co.* v. *Salopek*, 90 N. M. 410, 413, 564 P. 2d 615, 618 (1977), quoted *ante*, at 713, appears to mean nothing more than that the 1960 Act did not give the United States additional reserved water rights *with a priority date of before 1960*—a proposition with which I think we all would agree.  Cf. *ante*, at 713–714, n. 21.  But there never has been a question in this case as to whether the 1960 Act gave rise to additional reserved water rights with a priority date of 1960 or later in the Gila National Forest.

I

My analysis begins with the language of the statute. The Organic Administration Act of 1897, as amended, 16 U. S. C. § 475 (1976 ed.), provides in pertinent part:

"No national forest shall be established, except to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber for the use and necessities of citizens of the United States . . . ."

Although the language of the statute is not artful, a natural reading would attribute to Congress an intent to authorize the establishment of national forests for three purposes, not the two discerned by the Court. The New Mexico Supreme Court gave the statute its natural reading in this case when it wrote:

"The Act limits the purposes for which national forests are authorized to: 1) improving and protecting the forest, 2) securing favorable conditions of water flows, and 3) furnishing a continuous supply of timber." *Mimbres Valley Irrigation Co.* v. *Salopek,* 90 N. M. 410, 412, 564 P. 2d 615, 617 (1977).

Congress has given the statute the same reading, stating that under the Organic Administration Act of 1897 national forests may be established for "the purposes of improving and protecting the forest or for securing favorable conditions of water flows, and to furnish a continuous supply of timber . . . ." H. R. Rep. No. 1551, 86th Cong., 2d Sess., 4 (1960), quoted *ante,* at 714–715; accord, S. Rep. No. 1407, 86th Cong., 2d Sess., 4 (1960). See also Note, New Mexico's National Forests and the Implied Reservation Doctrine, 16 Natural Resources J. 975, 991–992 (1976).

"[T]he Court not surprisingly attempts to keep this provision in the background, addressing it only . . . in a footnote," *United States* v. *Sotelo,* 436 U. S. 268, 283 (1978) (REHN-

QUIST, J., dissenting), where it decides that the Act should be read as if it said national forests may "be created only 'to improve and protect the forest within the boundaries,' or, *in other words,* 'for the purpose of securing favorable conditions of water flows, and to furnish a continuous supply of timber.' " *Ante,* at 707 n. 14 (emphasis in original).[2] The Court then concludes that Congress did not mean to "improve and protect" any part of the forest except the usable timber and whatever other flora is necessary to maintain the watershed. This, however, is not what Congress said.

The Court believes that its "reading of the Act is confirmed by its legislative history." *Ibid.* The matter is not so clear to me. From early times in English law, the forest has included the creatures that live there. J. Manwood, A Treatise and Discourse of the Laws of the Forrest 1–7 (1598); 1 W. Blackstone, Commentaries *289. Although the English forest laws themselves were not transplanted to the shores of the new continent, see generally Lund, Early American Wildlife Law, 51 N. Y. U. L. Rev. 703 (1976), the understanding that the forest includes its wildlife has remained in the American mind. In establishing the first forest reservations, the year before passage of the Organic Act of 1891, Congress exhibited this understanding by directing the Secretary of the Interior to "provide against the wanton destruction of the fish . . . and game found within said reservation, and against their capture or destruction, for the purposes of merchandise or profit." Act of Oct. 1, 1890, § 2, 26 Stat. 651.[3]

---

[2] In fact, the Court appears to show some ambivalence as to whether, in its view of the 1897 Act, national forests are to be reserved for two purposes, or only one. See *ante,* at 711–713.

[3] The Act cited is entitled "An act to set apart certain tracts of land in the State of California as *forest reservations.*" 26 Stat. 650 (emphasis supplied). Yosemite National Park was not carved out of the forest reserved by the 1890 Act until 1905. See Act of Feb. 7, 1905, 33 Stat. 702–703, 16 U. S. C. § 46 (1976 ed.). A portion of the land reserved by

Similarly, the bill introduced by Representative McRae in the 54th Congress, upon which the Court relies in construing the statute, *ante,* at 707–708, n. 14, directed the Secretary, "to preserve the timber and other natural resources, and such natural wonders and curiosities and game as may be therein, from injury, waste, fire, spoliation, or other destruction . . . ." H. R. 119, 54th Cong., 1st Sess., 28 Cong. Rec. 6410 (1896). The bill that became law in the 55th Congress substituted for this provision the independent "improve and protect the forest" clause together with a general direction that the Secretary "make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction . . . ." Organic Administration Act of 1897, 30 Stat. 35, 16 U. S. C. § 551 (1976 ed.). Despite this rephrasing, Congress remained of the view that wildlife is part of the forest that it intended to "improve and protect" by passage of the 1897 Act, for in its first appropriation to implement the Act it directed that

> "forest agents, superintendents, supervisors, and all other persons employed in connection with the administration and protection of forest reservations shall in all ways that are practicable, aid in the enforcement of the laws of the State or Territory in which said forest reservation is situated, in relation to the protection of fish and game . . . ." Act of Mar. 3, 1899, 30 Stat. 1095.

See also Act of May 23, 1908, 35 Stat. 259, 16 U. S. C. § 553 (1976 ed.). This understanding has continued down to the present day. See, *e. g.,* Act of May 22, 1928, § 5, 45 Stat. 701, 16 U. S. C. § 581d (1976 ed.) (authorizing annual appropriations "[f]or such experiments and investigations as may be necessary in determining the life histories and habits of forest

---

the 1890 Act remained a forest reserve and was designated the Sierra National Forest.

animals, birds, and wildlife"); Act of Mar. 29, 1944, § 1, 58 Stat. 132, 16 U. S. C. § 583 (1976 ed.) (authorizing the Secretary to establish sustained-yield units "in order to provide for a continuous and ample supply of forest products; and in order to secure the benefits of forests in maintenance of water supply, regulation of stream flow, prevention of soil erosion, amelioration of climate, *and preservation of wildlife* . . . .") (Emphasis supplied.) [4]

One may agree with the Court that Congress did not, by enactment of the Organic Administration Act of 1897, intend to authorize the creation of national forests simply to serve as wildlife preserves. But it does not follow from this that Congress did not consider wildlife to be part of the forest that it wished to "improve and protect" for future generations. It is inconceivable that Congress envisioned the forests it sought to preserve as including only inanimate components such as

---

[4] The understanding that the forest includes the creatures that live there is confirmed by the modern view of the forest as an interdependent, dynamic community of plants and animals:

"The forest community, then, consists of an assemblage of plants and animals living in an environment of air, soil, and water. Each of these organisms is interrelated either directly or indirectly with virtually every other organism in the community. The health and welfare of the organisms are dependent upon the factors of the environment surrounding them; and the environment surrounding them itself is conditioned to a considerable degree by the biotic community itself. In other words, the plants, the animals, and the environment—including the air, the soil, and the water— constitute a complex ecological system in which each factor and each individual is conditioned by, and in itself conditions, the other factors comprising the complex." S. Spurr, Forest Ecology 155 (1964).

See also Gosz, Holmes, Likens, & Bormann, The Flow of Energy in a Forest Ecosystem, 238 Scientific American No. 3, pp. 92–102 (1978). Thus, it is doubtful whether the timber and watershed that the Court prizes so highly could flourish without a complement of wildlife. The recognition by modern science of this vital interdependence is by no means a new discovery. See J. Manwood, A Treatise and Discourse of the Laws of the Forrest 6 (1598).

the timber and flora. Insofar as the Court holds otherwise, the 55th Congress is maligned and the Nation is the poorer, and I dissent.[5]

## II

Contrary to the Court's intimations, cf. *ante*, at 711–713, I see no inconsistency between holding that the United States impliedly reserved the right to instream flows, and what the Court views as the underlying purposes of the 1897 Act. The national forests can regulate the flow of water—which the Court views as "the very purpose for which Congress did create the national forest system," *ante*, at 711–712—only for the benefit of appropriators who are downstream from the reservation. The reservation of an instream flow is not a consumptive use; it does not subtract from the amount of water that is available to downstream appropriators. Reservation of an instream flow therefore would be perfectly consistent with the purposes of the 1897 Act as construed by the Court.[6]

I do not dwell on this point, however, for the Court's opinion cannot be read as holding that the United States never reserved instream flows when it set aside national forests under the 1897 Act. The State concedes, quite correctly on the Court's own theory, that even in this case "the United States

---

[5] No doubt it will be said that the waterflow necessary to maintain the watershed including the forest will be sufficient for the wildlife. This well may be true in most national forests and most situations. But the Court's opinion, as I read it, recognizes no reserved authority in the Federal Government to protect wildlife itself as a part of the forest, and therefore if and when the need for increased waterflow for this purpose arises the Federal Government would be powerless to act. Indeed, upstream appropriators could be allowed to divert so much water that survival of forest wildlife—including even the fish and other life in the streams— would be endangered.

[6] It is true that reservation of an instream flow might in some circumstances adversely affect appropriators upstream from the forest. There would be no inconsistency with the 1897 Act, however, for that Act manifestly was not intended to benefit upstream appropriators.

is not barred from asserting that rights to minimum instream flows might be necessary for erosion control or fire protection on the basis of the recognized purposes of watershed management and the maintenance of timber." Brief for Respondent 44 n. 11. Thus, if the United States proves, in this case or others, that the reservation of instream flows is necessary to fulfill the purposes discerned by the Court, I find nothing in the Court's opinion that bars it from asserting this right.