KERR–McGEE CORPORATION, et
al., Plaintiffs,

v.

Donald P. HODEL, et al., Defendants.

GLOBAL EXPLORATION AND DE-
VELOPMENT CORPORATION,
Plaintiff,

v.

Donald P. HODEL, et al., Defendants.

Civ. A. Nos. 83–0322, 80–1085.

United States District Court,
District of Columbia.

Feb. 6, 1986.
As Amended June 27, 1986.

Bruce Barkett, James Sloan, Sydney H. McKenzie, State of Fla., Tallahassee, Fla., for defendant intervenors State of Fla. and Gov. Robert Graham.

Patrick A. Parenteau, Thomas Lustig, Norman Dean, Nat. Wildlife Federation, Washington, D.C., for defendant intervenors Senator Lawton Chiles, Senator Paula Hawkins, Nat. Wildlife Federation, Florida Wildlife Federation, and Natural Resources Defense Counsel.

Michael Bean, James T.B. Tripp, Environmental Defense Fund, New York City, for defendant intervenors Florida Defenders of the Environment, Environmental Defense Fund, Florida Audubon Soc.

Peter J. Nickles, William P. Skinner, Covington & Burling, Washington, D.C., for plaintiff Kerr-McGee Corp.

Elmo R. Hoffman, Parker, Johnson Owen and McGuire, Orlando, Fla., William C. Cramer, Cramer Haber & Lukis, Washington, D.C., for plaintiff Global Exploration.

Wells Burgess, Gerald Fish, Todd D. Peterson, R. John Seibert, Dept. of Justice, Washington, D.C., for defendant Watt.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

In this consolidated proceeding, the Kerr-McGee Corporation ("Kerr-McGee") and

the Global Exploration and Development Corporation ("Global") seek declaratory, injunctive, and mandatory relief compelling the Department of Interior ("Interior") and the Secretary of Interior to issue them preference rights mining leases for phosphate mining in the Osceola National Forest ("Osceola Forest" or "Forest"), located in the State of Florida. The Department of Agriculture ("Agriculture") and its Secretary are also named defendants. At an early stage in the litigation the State of Florida, its Governor and United States Senators, the National Wildlife Federation, the Environmental Defense Fund, the Natural Resources Defense Council, and other environmental groups were allowed to intervene as party defendants.

The matter is before the Court on cross motions for summary judgment. Plaintiffs contend that on January 10, 1983, the Secretary of Interior wrongfully denied their applications for phosphate leases thus depriving them of vested rights to engage in phosphate mining. In response to those allegations, the federal defendants and the intervenors contend that the applications were denied because the reclamation technologies relied upon and proferred by the plaintiffs were inadequate to ensure restoration of the mined portions of the Osceola Forest to the purposes for which they were acquired and the historical uses to which they had been put, as required by the Mineral Leasing Act for Acquired Lands, 30 U.S.C. §§ 351 *et seq.* (1982). Specifically, the Secretary found that plaintiffs had not discovered "valuable deposits" of phosphate as required under the Act, because the costs of reclamation would be prohibitively high.

The parties' legal memoranda, their numerous exhibits and affidavits have been considered, and otherwise, the matter has been well briefed and ably presented by counsel. While there are differences in emphasis and focus among the parties as to various factual matters, the Court does not find that there are significant disputes or differences as to material facts. Only legal issues remain for final resolution, thus,

an award of summary judgment is appropriate.

The Court concludes that the Secretary of Interior was justified in his decision denying and disapproving the Kerr-McGee and Global lease applications and the relief they seek should be *denied* and their lawsuits *dismissed.* The reasons for that conclusion are set out in the discussion which follows.

## BACKGROUND

### A.

The Osceola National Forest was established in 1931 by President Herbert Hoover pursuant to the Creative Act of 1891, 26 Stat. 1103, Mar. 3, 1891. The vast majority of the Forest was acquired under the authority of the Weeks Act of 1911, Ch. 186, 36 Stat. 961, as amended by Act of June 7, 1924, Ch. 348, 43 Stat. 654. The primary purposes behind the acquisition and development were timber production, water shed protection, fish and wildlife protection, and preservation and maintenance of recreational opportunities. National Forest Preservation Comm'n., Sen. Doc. No. 44, 71st Cong., 2d Sess. 6 (1929). Osceola Forest consists of nearly 158 thousand acres located in North-Central Florida. Included within that acreage are cypress swamps, pine lands, unique hardwood wetlands, and upland hardwood forests. Highly diverse creek and river systems, within the area serve as a source of high quality surface and ground water, and provides an important water shed for North-Central Florida. The Forest also provides a home for important varieties of fish and wildlife species and for a number of valued and certain limited and endangered species. 1979 Supplement to the Final Environmental Statement, *infra* p. 625.

The authority for phosphate leasing on federal land and the limits on the Interior Secretary's ability to lease, depends upon whether the lands are classified as "public domain" or "acquired" lands. Public domain lands are lands that have never left the control of the United States. The Min-

eral Leasing Act, 30 U.S.C. §§ 181, 211(b) *et seq.*, authorizes the Secretary to lease phosphate deposits on those lands. Public domain lands comprise a very limited portion of the Osceola National Forest.

For acquired lands, lands that have been either granted or sold to the United States, the source of mineral leasing authority stems from the Mineral Leasing Act for Acquired Lands, 30 U.S.C. § 352. That section provides in relevant part:

No mineral deposit covered by this section shall be leased except with the consent of the head of the executive department ... having jurisdiction over the lands containing such deposit ... and subject to such conditions as that official may prescribe to insure the adequate utilization of the lands for the primary purposes for which they have been acquired or are being administered....

The Act also establishes the authority and conditions under which the Interior Secretary may issue phosphate leases. And, as is the case here, the Secretary must secure the consent of other departments or agencies which, because of concurrent jurisdiction over the lands, may impose requirements or stipulations. The Forest includes a significantly larger proportion of acquired lands as compared with public domain lands.

During the mid-to-late 1960s, the plaintiffs applied to the Interior Department for permits to prospect for phosphate deposits on acquired lands. The permits were issued by the Department's Bureau of Land Management pursuant to the Mineral Leasing Act for Acquired Lands and were made expressly subject to all regulations, then existing or subsequently enacted, including Special Stipulations required by the Forest Service, Department of Agriculture. The Stipulations, designed to restore and protect the surface value of the land to be mined, were attached to and made a part of the permits, *infra* pp. 625–26.

Subsequently, between 1969–1972, the plaintiffs applied to Interior for preference right leases to mine phosphate on the lands embraced by their prospecting permits alleging discovery of "valuable deposits" within the meaning of section 211(b) of the Mineral Leasing Act. Thereafter, the United States Geological Survey certified that valuable deposits had been discovered and recommended that leases be issued. The certifications were based on quality and quantity standards that had been applied by the Interior Department for some time. In 1976, Kerr-McGee filed suit to compel the Interior Department to issue the leases, *infra* pp. 623–24.

**B.**

The present litigation is the latest of several law suits filed in recent years, relating to phosphate mining in the Forest. In July 1971, the State of Florida commenced an action in this District Court (*State of Florida v. Morton*, Civil No. 1496–71), seeking, *inter alia*, to enjoin the Department of Interior from proceeding further with processing lease applications for phosphate mining in Osceola as well as to compel the Secretary of Interior to undertake thorough ecological and economic studies of the effect of phosphate mining upon the natural resources of Florida. The plaintiff's application for a preliminary injunction was denied, the Court finding that the Interior Department had indefinitely suspended all applications for prospecting permits and leases on the Osceola Forest lands and that no final administrative action would be taken on pending or future permits or leases on the lands prior to completion of an environmental impact statement.

In response to that litigation, the Department undertook in early 1972, the preparation of an environmental analysis and meanwhile, suspended all actions on pending lease applications. In June 1974 a Final Environmental Statement on Phosphate Leasing on the Osceola National Forest in Florida ("1974 Final Environmental Statement"). The Statement analyzed the environmental impact of phosphate mining upon various aspects of the Osceola Forest, including the areas' water supply, wildlife, and other natural resources, and reviewed

various measures proposed to lessen and mitigate adverse environmental effects.

In April 1976, Kerr-McGee also filed a proceeding in this District Court (*Kerr-McGee Chemical Corp. v. Kleppe*, Civil No. 76–0608) seeking to compel the Interior Secretary to issue leases in response to several applications which had been pending for more than five years. The Court of Appeals reversed a trial court order directing the immediate issuance of the leases, reasoning that the on-going administrative proceedings before the Interior Secretary were aborted and that Kerr-McGee should first exhaust its remedies at the agency level before seeking judicial relief. Several years later, in April 1978 plaintiff Global also filed a complaint in this District Court (*Global Exploration & Development Corporation v. Andrus*, Civil No. 78–0642) to compel the Interior Secretary to issue the leases it now seeks in this litigation. That action was dismissed as premature by the trial court a few months later on similar grounds, that Global failed to exhaust administrative remedies.[1]

In May 1982 the State of Florida, its Governor, Senators, and several environmental groups filed two separate complaints in the Middle District of Florida District Court (*State of Florida v. Watt*, Civil Nos. 82–421 and 82–423). Those plaintiffs sought to enjoin the Interior Secretary from processing applications for phosphate leases, from rendering any determination of whether lease applicants complied with all statutory requirements, and from issuing leases until such time as the federal officials prepared final lease stipulations which met the essential requirements of law and were based upon scientific evidence concerning the success of restoration of affected lands in the Forest. The Florida District Court dismissed the complaints, ruling that the proper course to follow was to permit the Interior Secretary to determine, without judicial intervention, whether a valuable phosphate deposit existed—again allowing the administrative process to run its course.

### C.

Aside from the above litigation, the plaintiffs and several other companies concerned with phosphate exploration and mining in Osceola, have pursued their efforts to secure mining leases from the government for 20 years or more. A brief account of those developments provides a better understanding of the issues involved.

The key to the issuance of a phosphate lease is governed by an interpretation of the phrase "valuable deposit of phosphate" within the meaning of the Mineral Leasing Act, 30 U.S.C. § 211(b). From 1960 and extending through 1970, the determination as to whether a phosphate prospecting permittee had discovered valuable deposits was undertaken by Interior officials on basis of physical characteristics, namely, the quality, quantity, thickness and extent of a deposit. This approach was used without regard for mining and marketing costs or other factors bearing upon the economic feasibility of mine development. During this period, there was no regulation, decision, opinion or instruction reflecting a departmental interpretation of the term as used in the Act, or purporting to recognize the propriety of the practice.

Over the period 1969–1972, both Kerr-McGee and Global filed applications with the Interior Department for leases to mine phosphate in Osceola claiming a discovery of valuable phosphate deposits. Following publication of the 1974 Final Environmental Statement, *supra*, pp. 623–24, the Solicitor of the Interior opined in a memorandum of June 30, 1975 (K–M Exhibit 60), the meaning of the words "valuable deposits," as used in section 211(b) and other sections of the Mineral Leasing Act. He concluded at page 12 that

> The use by the Congress of the identical term ["valuable deposits"] in the Mining Law of 1872, the 1917 Potassium Act, and the Mineral Leasing Act shows that

---

1. The April 1976 and April 1978 lawsuits filed by Kerr-McGee and Global involve the same lease applications at issue in this consolidated proceeding.

it intended the test to be the same under all three statutes. The meaning commonly recognized for valuable deposit at that time was the prudent man test. Shortly thereafter, in October 1975, additional studies showing the impact of phosphate leasing on hydrology and endangered species were directed by the Interior Secretary. At that point, all actions on pending phosphate lease applications in Osceola were suspended pending completion of the studies.

On May 7, 1976, shortly after the lawsuit, *Kerr-McGee v. Kleppe* was filed in this District Court, the Interior Department promulgated new regulations—41 Fed.Reg. 18847. This regulation[2] formally defined "valuable deposit" of phosphate, as used in the Mineral Leasing Act, as a deposit "of such a character and quantity that a prudent person would be justified in the further expenditure of his labor and means with a reasonable prospect of success in developing a valuable mine." The regulation also provided that a permittee must "show that there is a reasonable expectation that ... revenues from the sale of the mineral will exceed ... costs of developing the mine, and extracting, removing and marketing the mineral."[3]

Meanwhile, in early 1978, the additional studies initiated in October 1975 by the Secretary on the impact of phosphate leasing on hydrology and endangered species were completed. The Bureau of Land Management was then directed to prepare a supplement to and to otherwise update the 1974 Final Environmental Statement. In response, the Department published in October 1979, a Final Supplement to the Final Environmental Statement on Phosphate Leasing on the Osceola National Forest, Florida (1979 Final Supplemental ES). Defendants' Exhibit 4.

During the period 1978–1981, both plaintiffs submitted to the Bureau of Land Management the information required for an "initial showing" of lease entitlement under the 1976 regulations. Specifically, in compliance with the newly adopted regulations calling for a description of the proposed measures to be taken to reclaim the surface, the plaintiffs responded and indicated that they intended to utilize a form of sand/clay mix technology for surface reclamation of the mined area. Kerr-McGee indicated that it would utilize a so-called "sand-spray process" developed at Brewster Phosphates.[4] On strength of those representations, the Bureau of Land Management advised Kerr-McGee and Global that their initial showings complied with the regulations.

**D.**

On February 4, 1982, the Forest Service of the Agriculture Department submitted to the Bureau of Land Management the final requirements to be attached to Kerr-McGee's and Global's lease applications. This was required of all applicants in order to proceed with the "final showings" as required under the new regulations. In turn, the Bureau was required to attach the stipulations to any lease which might be issued to phosphate lease applicants in Osceola Forest. The Forest Service then submitted a requirement to be attached to all leases. The requirement, Stipulation No. 4, specified that:

> The lessee shall, except for permanent lakes created by mining, reestablish watercourses, soil stability and productivity, approximate landforms and eleva-

---

**2.** The 1976 regulations, as later amended, are contained and codified at 43 C.F.R. Part 3520 (1982).

**3.** Prior to 43 C.F.R. § 3520.1–1(c), the determination as to whether a prospecting permittee had discovered "valuable deposits" was based on the physical characteristics of the mineral deposit in question, namely, the quality, quantity, thickness and extent of the deposit, as indicated by exploratory work performed under the prospecting permit. The plaintiffs rely heavily on the "quality and quantity standard" that the Department of Interior had regularly applied, without regard for other factors affecting the economics of mining. (*See* Defendants' Motion for Summary Judgment, p. 11.)

**4.** Brewster Phosphates is owned by a partnership consisting of Kerr-McGee and American Cynamid.

tions, and wetland and upland of similar vegetative communities and species diversity in approximate proportions as those existing prior to mining. *The purpose of reclamation is to reestablish plant and aquatic communities with similar interspersion of community types, i.e., pine flatwoods, cypress swamps, creek swamps and lakes.* The soil medium shall be *reestablished* to support forest tree growth by: (a) providing a ratio of clay to sand in a mixture that will retain sufficient moisture and nutrients in the root zones of forest trees making up the vegetative community; (b) by returning overburden, including topsoil, over the clay and sand mixture. (emphasis added)

By August 1982, both Kerr-McGee and Global had submitted the required "final showings." In responding to the requirement that they provide information as to the estimated cost of complying "with applicable regulations, reclamation and environmental standards, and proposed lease terms," they submitted costs based upon their intended use of sand-clay mix reclamation processes.

While the 1974 Final Environmental Statement contained a general discussion of the importance of and the problems of reclamation, it did not present or discuss government reclamation standards or the possibility of meeting them. Indeed, it was pessimistic on the possibility of reclamation of native species following phosphate mining, particularly with reference to swamp hardwood plant communities. It noted that differences in climate and soil between Central and North Florida made projecting reclamation results from the former area to the Osceola difficult. The 1978 hydrology and endangered species reports which the Interior Secretary initiated in 1975 did not address the pertinent reclamation issues presented in the 1982 law suits filed before the Middle District of Florida federal court.

The 1979 Supplemental ES, described reclamation methods currently in use and in development, including the sand spray and other processes for creating a sand/clay mix fill. However, it expressed qualified optimism and doubt about the success of reclamation efforts based on the then present state of technological knowledge. It stated that observations of trial planting suggested that reclamation to wooded upland and wetland communities was "possible," and concluded that "the present primitive state-of-the-art of phosphate mine reclamation" precluded the evaluation of the potential impact of future mining and reclamation by extrapolating cited results. It also concluded that research was needed to provide techniques for reestablishing the plant species and vegetative community types then found. Otherwise, it reaffirmed the pessimism on revegetation of native species as was noted in the 1974 Final Environmental Statement.

In October 1981, a Forest Service team submitted an evaluation of the Brewster sand-spray process of reclamation focusing on the use of the sand/clay mix as a growth medium.[5] (K–M Ex. 37.) At that point only 15 percent of the Brewster areas had been reclaimed. The evaluation reported that plant life in the Forest would be very difficult to reestablish and productivity levels would be low on land reclaimed by the observed process. It postulated that if a uniform (homogeneous) mix of sand tailings and clay slimes could be achieved, this would provide a "satisfactory base" for the Forest, pp. 3, 40. However, the report specifically found that a homogeneous mix had not yet been achieved, pp. 3, 40.

**E.**

In September 1982 and in response to the lawsuits filed in the Florida federal courts, *supra* p. 624, the Interior Secretary established an interagency task force to assess reclamation technology and to prepare a supplemental Environmental Assessment ("EA") on the environmental consequences

---

**5.** Report of a Brief Evaluation of Phosphate Mining Reclamation Completed by the Brewster

Process of Applying Sand Tailings to Clay Slimes.

of reclamation technologies. This assessment considered advances in reclamation technology and evaluated the effectiveness of the advances as related to phosphate mining in Osceola. An interdepartmental team of career professionals, experts in their fields, was selected by the Bureau of Land Management. Consultants were relied upon in preparing the study including representatives of the phosphate industry and phosphate mining companies, the United States Environmental Protection Agency, the Army Corps of Engineers, and representatives of the State of Florida.

The interdepartmental team conducted a full review of available scientific literature on phosphate mining reclamation, particularly wetlands reclamation, undertook field trips to on-going reclamation project sites—including those then underway at a Brewster phosphate mine using the sand-spray process. The team also reviewed the 1974 Final Environmental Statement, the 1979 Supplemental ES and the 1981 Forest Service evaluation of the Brewster process.

An exhaustive review and study of the conventional and experimental methods of reclaiming lands mined for phosphate was undertaken and on January 7, 1983, the interdepartmental team published its report. Environmental Assessment on State of Reclamation Techniques on Phosphate Mined Lands in Florida and Their Application to Phosphate Mining in the Osceola National Forest, Bureau of Land Management. The study concluded that no new technology had been developed since the 1979 Supplemental ES and that technology capabilities were insufficient to ensure a reasonable likelihood of the successful reclamation of mined areas consistent with the requirements established for mining in Osceola. As to the Brewster sand-spray process, the team found that it still had not achieved the homogeneous mix of sand and clay, a noted deficiency in the 1981 Forest Service Report, and that on basis of available information, it was impossible to project to the Forest results from tests of sand/clay mix techniques.

The interdepartmental team report was then transmitted to the Interior Secretary with the recommendation that all pending lease applications in Osceola National be rejected. The Secretary assumed full jurisdiction over the matter and on January 10, 1983, issued his decision rejecting Kerr-McGee's and Global's lease applications. His decision was predicated on a determination that:

* * * [A] mineral deposit discovered under a prospecting permit must be of "such a character and quantity that a prudent person would be justified in the further expenditure of his labor and means with a reasonable prospect of success in developing a valuable mine." The Forest Service, as prescribed by law, has established reclamation stipulations which were used in processing [plaintiffs'] preference right lease applications. The Department of the Interior has performed studies which indicate current technology is not capable of meeting the prescribed reclamation standards. The fact that no reclamation technology exists which can reclaim these lands precludes the possibility that this phosphate deposit could meet the valuable deposit test.

Prior to the Secretary's determination, no decision purporting to accept or reject plaintiffs' lease applications had been rendered. No draft evaluation or internal analysis of whether plaintiffs had discovered valuable deposits of phosphate, prepared prior to the January 7, 1983 Environmental Assessment, considered the question of compliance with government reclamation standards and the stipulations proposed and established by the Forest Service.

Although Kerr-McGee and Global dispute the Environmental Assessment team's conclusion as to the feasibility of reclamation of Osceola lands following phosphate mining, they have not identified or referred to any significant and factual data which were not considered in the preparation of the 1983 Environmental Assessment report.

**F.**

The plaintiffs charge that the 1983 decision of the Interior Secretary was impermissibly tainted by political considerations. While the record shows that there was intense lobbying and political activity exercised by parties both in support of as well as opposed to phosphate mining in the Osceola Forest, there is no hard credible evidence to support such a charge. Further, the sequence of events and developments prior to the Secretary's action do not support much less compel an inference that political considerations or factors unduly influenced his decision in any manner.

Plaintiffs refer to several memoranda, between employees of the executive branch in late 1982 and early 1983 as evidence of political interference and taint (K–M Exs. 45–49). The exhibits have been reviewed and considered and when considered along with other relevant portions of the record, do not support the plaintiffs' claims.

In the more than 12-year lapse of time when plaintiffs first filed their lease applications to January 1983, there were unresolved disputes about relevant and basic technical issues necessary to a final decision. Disputes were found within the units of the Departments of Interior and Agriculture, the agencies which had the responsibility of helping to decide the question as to whether phosphate strip mining could be consistent with the primary purposes behind the acquisition and development of the Forest, and equally important—whether technologies were developed and available which would allow restoration of the land. The disputes were found principally between those agencies responsible for mineral exploitation and development—the Geological Survey Service and Minerals Management Service and those responsible for resource management protection—the Forest Service, the Fish and Wildlife Service. The latter consistently took the position that phosphate strip mining would lay waste portions of Osceola Forest and that technologies did not exist to allow post-mining *restoration* of the Forest. This proposition and supporting evidence were advanced in the 1974 Final Environmental Statement and the 1979 Final Supplemental ES. Further, in early 1980 and 1981, the incumbent Secretaries of the Agriculture Department re-emphasized the position of the Forest Service that technologies did not exist to restore the Forest consistent with its purpose. But later in 1981, statements began to surface from responsible spokesmen in Agriculture and representatives of the Environmental Protection Agency began to make statements that technologies were becoming available to restore the Forest. (K–M Exs. 89–91.)

**ANALYSIS**

The Osceola National Forest is predominately acquired land and was purchased by the federal government for special purposes. As such, it is accorded a protective status. The primary purposes for which it is being administered by the Forest Service include timber production, water shed protection, recreation, and fish and wildlife. 16 U.S.C. § 528. The Weeks Act of 1911, under which the Forest was purchased, gave the Secretary of Agriculture authority to recommend lands for purchase "as in his judgment may be necessary to the regulation of the *flow of navigable streams* or for the *production of timber....*" 43 Stat. 654 (1924) (emphasis added). The National Forest Preservation Commission, created by the Congress, with instructions to prepare acquisition reports under the Weeks Act, recommended purchasing the lands which became the Osceola National Forest. The Commission's report emphasized timber production and water shed protection, as well as recreation and wildlife, as the primary purposes of the acquisition. National Forest Preservation Comm'n., Sen. Doc. No. 44, *supra* p. 622.

The basic purposes of national forest lands are also found in the Organic Administration Act of 1897, through which Osceola National Forest was created. The Act provided that "no national forest shall be established, except to improve and protect the forest within the boundaries, or for the purpose of securing favorable conditions of

water flows, and to furnish a continuous supply of timber...." 16 U.S.C. § 475. The Supreme Court had occasion to consider the Organic Act and its legislative history in *United States v. New Mexico*, 438 U.S. 696, 98 S.Ct. 3012, 57 L.Ed.2d 1052 (1978). It concluded: "Congress intended national forests to be reserved for only two purposes—'[t]o conserve the water flows, and to furnish a continuous supply of timber for the people.'" *Id.* at 707, 98 S.Ct. at 3017 (quoting 30 Cong.Rec. 967 (1897)).

Nowhere in the substantial legislative history of the purposes of the national forests in general or the Osceola National Forest in particular, is there included a reference to mineral development or phosphate mining. Indeed, it appears that mineral development is incompatible with the primary purposes and uses of the forest and has a great potential of destroying the natural resources of the Forest. Strip mining, the technique used to secure the phosphates, is highly destructive of natural resources. In the process, the forest areas to be mined are leveled, cleared of all vegetation and trees, and wetland areas are drained. The overburden has a depth of 20 to 60 feet. Electrical powered walking draglines, resembling giant scoops, strip the overburden and dig the mining cuts to remove the phosphate matrix averaging 8 to 10 feet thick from the earth. The mining cuts formed by these draglines average 150–200 feet wide and several thousand feet in length. 1974 Final Environmental Statement, *supra* pp. 623–624, at 1–9.

The acquired lands of the United States which are included in the Osceola Forest may be leased for mineral development only upon conditions imposed by the Mineral Leasing Act for Acquired Lands, 30 U.S.C. § 351 *et seq.* Section 3 of the Act, vests in the Interior Secretary the authority to issue a mineral lease with the consent of the head of the executive department having jurisdiction over the lands where the mineral deposits are located. The latter official may prescribe such conditions as necessary "to insure the adequate utilization of the lands for the primary purposes for which they have been acquired or are being administered." 30 U.S.C. § 352. The de-

termination of what conditions should be imposed if a mineral lease is issued on national forest land is thus committed by law to the Secretary of Agriculture.

Applicants such as Kerr-McGee and Global, to ensure their entitlement to phosphate leases, are required to demonstrate the discovery of "valuable deposits" of phosphates on the lands covered by their prospecting permits 30 U.S.C. § 211(b). The term "valuable deposits of phosphates" as used in 30 U.S.C. § 211(b) is found in 43 C.F.R. 3520.1–1(c). *See Utah International Inc. v. Andrus*, 488 F.Supp. 962, 968–69 (D.Utah 1979).

In determining whether a prospecting permittee has discovered a "valuable deposit" of phosphate, the cost of compliance with lease terms is an important element which must be considered, and if the applicant lacks the technological capability to comply with prescribed lease terms, he cannot satisfy the test and is not entitled to a lease. *Natural Resource Defense Council, Inc. v. Berklund*, 458 F.Supp. 925, 936–37 (D.D.C.1978), *aff'd*, 609 F.2d 553 (D.C. Cir.1979). The restoration technologies necessary to insure the adequate utilization of the Osceola Forest for its primary purposes did not exist in January 1983 or in 1984, and did not exist at any earlier time. To demonstrate the discovery of "valuable deposits" of phosphates, Kerr-McGee and Global must comply with the terms and conditions imposed by the Forest Service and are required to show the economic and technological feasibility of reclaiming the lands covered by the lease applications.

Until February 1982, when the Forest Service submitted to the Bureau of Land Management the final stipulations to be attached to any leases which might be issued to phosphate lease applicants in the Forest, the Interior Secretary could not determine whether the plaintiffs had satisfied the "valuable deposit" test, and no lease entitlement was vested in the plaintiffs. The earlier practices of the Department of Interior in issuing phosphate preference right leases before 1970 did not alter or change the statutory requirements and did not establish a legal standard which the Interior Secretary was bound to

recognize in determining plaintiffs' lease entitlement. *Chevron, Inc. v. National Resources Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). Nor did the prior determination of the Geological Survey Service in 1969 and 1970, that Kerr-McGee had discovered valuable phosphate deposits on lands covered by its prospecting permits, vest any right to receive leases for which it made application. The same is true for any subsequent determination of the Geological Survey Service or any other departmental finding made between 1969 and 1983. None of those determinations precluded the Interior Secretary from subsequently finding that the requisite discovery had not been shown.

## CONCLUSION

The January 10, 1983, decision of the Secretary of Interior was not arbitrary and capricious but, rather, was justified and supported by substantial and credible evidence.