Justice HOBBS
Dissenting.
I respectfully dissent. In my view, the water court abused its discretion in granting the stay of this McCarran Amendment case. Relying on the same law the majority cites, I reach a contrary conclusion.
The plaintiffs are conducting a federal court lawsuit that pertains to the quantification and administration of federal reserved water rights for the Black Canyon of the Gunnison National Monument, now a national park. This federal suit challenges the authority of the Secretary of Interior and the National Park Service to approve and submit, through the United States Justice Department, an amended quantification claim and water rights administration settlement agreement to the water court in a McCarran adjudication.
The plaintiffs have requested the District Court for the United States District of Colorado to issue an order "securing river flows for the Black Canyon in quantities and with the frequencies necessary to ... serve the purposes for which the Black Canyon was reserved."
The allegations and prayers for relief in the federal court action transparently involve quantification and administration of the Black Canyon of the Gunnison reserved water right in relation to other rights, state and federal, on the Gunnison River. These water rights include those held by the United States for the Aspinall Unit of the Colorado River Storage Project Act, situated above the Black Canyon of the Gunnison National Park.
The MeCarran Amendment provides comprehensive jurisdiction in the water court to determine all factual and legal issues regarding the quantification and administration of the Black Canyon of the Gunnison reserved water right. Indeed, the water court had already recognized the existence of an implied federal reserved water right for the Black Canyon and was addressing the quantification and administration phase of the case, when some of the parties to the state water rights case initiated the federal case.
Neither state nor federal courts have exclusive jurisdiction over the issues involved in *1081 either action, but the McCarran Amendment highly favors deferral of the federal action to the ongoing state case. In my view, the plaintiffs' federal court litigation results in a piecemeal approach to the quantification and administration issues properly before the water court, the very result Congress sought to avoid by adopting the McCarran Amendment.
I.
Under the cireumstances, we should be ordering the water court to proceed with considering and determining all factual and legal issues pertaining to (1) the C.R.C.P. 15 motion of the United States to amend its quantification claims ("motion to amend"); and (2) the settlement agreement for administration of the interrelated rights on the river, pursuant to the agreement between the United States and the State of Colorado ("administration agreement"), along with all other matters presented. If the state and federal trial and appellate courts were to reach inconsistent results, the United States Supreme Court could, of course, resolve them.
A. The McCarran Amendment Comprehensively Waives Sovereign Immunity for State Court Determination of All Factual and Legal Issues Regarding Quantification and Administration of the Black Canyon Federal Reserved Water Right
Congress adopted the McCarran Amendment to confer on state courts the authority to adjudicate all factual and legal issues pertaining to the existence, nature, scope, and administration of federal reserved water rights of United States agencies and Native American Tribes. The comprehensive nature of this authority was delineated by the United States Supreme Court in the "Colorado trilogy": Colorado River Water Conservation District v. United States, 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976) ("Colorado River"); United States v. District Court in and for Water Division No. 5, 401 U.S. 527, 91 S.Ct 10083, 28 LEd.2d 284 (1971) ("Division No. 5"); United States v. District Court in and for Eagle County, 401 U.S. 520, 91 S.Ct. 998, 28 L.Ed.2d 278 (1971) ("Eagle County ").
Those cases arose out of repeated attempts by the United States Justice Department to have issues of federal law involving the adjudication and administration of reserved rights claims determined in the federal courts. Colorado prevailed in its view that the overarching congressional policy, upon proper joinder of the United States, was that all issues of law and procedure in such cases would be determined by the state courts, subject to review by the United States Supreme Court.
We have made it clear that "by enacting the McCarran Amendment, Congress recognized that the western states have a legitimate interest in and responsibility for the allocation of water resources within their borders, including the determination and adjudication of the water rights claimed by the United States." United States v. City and County of Denver, 656 P.2d 1, 9 (Colo.1982) ("City and County of Denver I"). These issues include the "volume and scope" of particular reserved rights claims: "(alll such questions, including the volume and seope of particular reserved rights, are federal questions which, if preserved, can be reviewed [by the United States Supreme Court] after final judgment by the Colorado court." Eagle County, 401 U.S. at 526, 91 S.Ct. 998. Through the McCarran Amendment, Congress intended "to promote certainty in water allocation by subjecting undeclared and unquantified federal water rights to state adjudication." United States v. Bell, 724 P.2d 631, 642 (Colo.1986).
Issues involving the interaction of state water rights with federal water rights are within the state court's authority to determine. Division No. 5, 401 U.S. at 529-80, 91 S.Ct. 1003 (holding that, "if there is a collision between prior adjudicated rights and reserved rights of the United States, the federal question can be preserved in the state decision and brought here for review").
In Bell, as here, we had before us a C.R.C.P. 15 motion by the United States to amend its previously submitted claims. We upheld the water court's denial of the motion, despite the contention of the United States that its substantive rights would be adversely affected by the procedural ruling:
*1082 The next question is whether the water court properly applied C.R.C.P. 15 in allowing the amendment. CRCP. 15(3) provides that after a responsive pleading is filed, pleadings may be amended by a party only by consent of the adverse party or by leave of court but that such "leave shall be freely given when justice so requires." The decision to grant an amendment is within the trial court's discretion. We have interpreted C.R.C.P. 15(a) liberally in allowing amendments.
Bell, 724 P.2d at 687 (internal citations omitted). We relied on the Senate Report to the McCarran Amendment in so holding: " 'it is essential that each and every owner along a given water course, including the United States, must be amenable to the law of the state, if there is to be a proper administration of the water law as it has developed over the years' " Id. at 648 (quoting S. Rep. 755 at 6).
In Bell, we upheld the water court's refusal to allow the United States to amend its late-noticed claim under C.R.C.P. 15, because the "McCarran Amendment's effect was to place federal reserved rights within the state adjudication system" and "certainty provided by adjudication of the United States' reserved rights through joining the United States in state court water adjudications would be destroyed." 724 P.2d at 645. Accordingly, in setting the priority date, quantifying the claim, and administering the right, federal substantive law and state procedural law apply. Id. at 6438.
In light of the clear and repeated congressional intent to allow the state court to proceed with resolving all issues involved with setting the priority, quantifying the claims, and administering the water rights-as construed by our decisions and those of the United States Supreme Court-L would hold that the water court abused its discretion by staying consideration of both the motion to amend and the administration agreement.
B. The Water Court's Stay Order Should Be Vacated
We should vacate the water court's stay order for the following reasons.
First, in my view, plaintiffs are mistaken when they (1) assert claims against the Secretary of the Interior and the National Park Service involving the quantification and administration of the Black Canyon of the Gun-nison reserved water right, and then (2) contend that issues involving the authority of that officer and ageney to submit the motion to amend and the administration agreement to the water court are exclusive to the federal court.
The McCarran Amendment expressly provides for the state court to decide all factual and legal issues affecting the quantification and administration of the right, which the plaintiffs' claims in federal court surely do: "[eclonsent is given to join the United States as a defendant in any suit (1) for the adjudication of the rights to the use of water of a river system or other source, or (2) for the administration of such rights" 48 U.S.C. § 666 (2004) (emphasis added).
In waiving the sovereign immunity of the United States in all such matters, the McCarran Amendment further recites that the United States "shall be subject to the judgments, orders, and decrees of the court having jurisdiction ... to the same extent as a private individual under the cireum-stances." Id.
In my view, plaintiffs are wrong in their federal court exelusivity contention. Although the claims in the federal suit are styled as Administrative Procedure Act claims, which is normally an area of exclusive federal jurisdiction, in essence they challenge the exercise and scope of discretion in federal agencies administering their water rights under state and federal law. The water court has authority under the McCarran Amendment, a special statutory proceeding established by Congress to which federal officers and agencies are subject, to decide all factual and legal issues involved in the motion to amend and the administration agreement. This authority includes review of the decision making of those officers and agencies regarding the motion to amend and the administration agreement. The requisite federal officers and agencies have already appeared in the water court through the representation *1083 of the United States, as have the plaintiffs who filed the federal court action.
Accordingly, I disagree with the majority's conclusion that the McCarran Amendment does not assert or imply that a state court "would have jurisdiction to review the decision making process of federal entities, such as Interior or the Park Service, for compliance with federal law." Maj. Op. at 1080. To the contrary, the assertions of federal agencies regarding their authority and the exercise of it are routinely at issue in McCar-ran adjudications.
While both the water court and the District Court have jurisdiction over federal reserved water right questions, the MeCarran Amendment prefers deferral of the federal court to the state court, not the other way around. Colorado River, 424 U.S. at 818-19, 96 S.Ct. 1286. If both actions proceed, inconsistent results between the state and federal courts, if any, can be resolved by the United States Supreme Court.
Second, should the water court's stay remain in effect and the federal action proceed, the federal courts-and ultimately the United States Supreme Court on review-will be deprived of the water court's comprehensive view of the interaction of all federal and state water rights on the Gunnison River. This view lies at the heart of the McCarran Amendment's grant of jurisdiction and authority for state court determinations. "The resolution of the complex issues relating to federal reserved rights requires the water court to have a proper factual predicate before an attempt is made to resolve the legal issues." City and County of Denver v. United States, 656 P.2d 36, 89 (Colo.1982).
The United States Supreme Court has emphasized that "[this careful examination is required both because the reservation is implied, rather than expressed, and because of the history of congressional intent in the field of federal-state jurisdiction with respect to allocation of water." United States v. New Mexico, 488 U.S. 696, 701, 98 S.Ct. 8012, 57 L.Ed.2d 1052 (1978). An evident purpose of the United States' motion to amend and administration agreement is to bring certainty, security, and reliability to water rights administration on the Gunnison River.
The integration of federal rights into the network of highly interdependent relative priorities for the use of water on common stream systems is the ultimate purpose of the McCarran adjudication. See City and County of Denver I, 656 P.2d at 20. Necessarily, the quantification and administration of the Black Canyon reserved water right is fact-specific. It involves mixed questions of fact and law and issues regarding, for example, congressional intent in approving construction of the federal Aspinall Unit of the Colorado River Storage Project in 1956. When it authorized that project to operate above the Black Canyon, Congress was fully aware of the Black Canyon Monument designation of 1983. Logically, it might have intended that the Black Canyon quantification be consistent with upstream Aspinall Unit storage and operation. At least, the water court should have the opportunity to address and decide this issue.
Indeed, the administration agreement that the plaintiffs ask the federal court to review appears to take into account Black Canyon flow requirements and exercise of the Aspi-nall Unit water rights vis-a-vis each other and within the context of other water rights on the Gunnison River. We have previously addressed the Aspinall water rights, as well as the subordination of those rights to a certain quantity of upstream state appropria-tive water rights in Board of County Commissioners v. Crystal Creek Homeowners Association, 14 P.3d 325 (Colo.2000).[1]
*1084 As the Secretary of Interior has duties and discretion in regard to both the national park and the reclamation project, carrying out those duties and implementing that discretion is not readily subject to piecemeal judicial review. Surely, Congress intended the McCarran Amendment's waiver of sovereign immunity to allow responsible federal officers and agencies the authority and ability to assert federal water interests in a manner that recognizes and accommodates important state water interests. Given that the United States' Black Canyon water right is an implied rather than an express water right, the managing agencies have discretion as to the management of the right.
Judicial involvement in such discretionary agency duties is just what the United States Supreme Court was concerned about when it found that Administrative Procedure Act claims cannot challenge agencies' discretion in carrying out a broad statutory mandate. See Norton v. Southern Utah Wilderness Alliance, - U.S. -, 124 S.Ct. 2873, 2881, 159 L.Ed.2d 137 (2004) ("If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved-which would mean that it would ultimately become the task of the supervising court, rather than the ageney, to work out compliance...."). By its very nature, the quantification of an implied reserved right is within the category of a broad statutory mandate; had Congress intended otherwise, it would have created an express reserved right.
In United States v. Idaho, 185 Idaho 655, 25 P.3d 117, 124-25 (2001), the Idaho Supreme Court considered the effect of congressional reclamation project approval on certain implied reserved water rights claims of the United States to waters of the Snake River. That court held that certain of the claimed reservations of water did not exist.
In the case before us, Colorado courts do recognize the existence of the implied federal reserved water right for the Black Canyon of the Gunnison; yet its quantification and administration may be impacted by other congressional intent and actions which, apparently, are not before the District Court. If the District Court orders the United States to increase its water claims, as the plaintiffs request, the result could well be an acre-foot for acre-foot reduction in the water use for those who depend on the Aspinall Project or its subordination to upstream rights.[2] Congress may have intended that this not occur, and the United States officers and agencies have discretion to discharge their broad statutory duties.
Accordingly, I disagree with the majority's conclusion that the "federal case will decide whether the United States' amended application complied with applicable federal law, and the state case will quantify the reserved water right." Maj. Op. at 1080. Such a neat distinction does not accord with the interrelated factual and legal issues in such a case as this, and, I conclude, derogates the long history of the Colorado courts' role in McCarran adjudications.
Unfortunately, some language of the federal court's April 15, 2004 order adopts the plaintiffs' characterization that the United *1085 States is "relinquishing" its water right and "disposing" of federal property. Of course, this is not so, in my view.> In the water court's McCarran proceeding, the United States bears the burden of demonstrating the amount of water necessary to prevent the entire defeat of the primary purposes of the Black Canyon reservation. See New Mexico, 438 U.S. at 700, 98 S.Ct. 3012. At this stage of the proceeding, the United States has only made claims to water, it has not obtained a decreed amount. As the water court has not yet quantified an amount, amending a claim cannot be characterized accurately as "disposing of property." Water right claimants often modify their claims in light of opposers' arguments and evidence. Until the water court issues its final decree quantifying the reserved right, the amount of water assigned to that right has not been duly ascertained. Onee the final decree quantifies the right, the United States will have a property interest in the use of a specified amount of water.
The federal court's order referring to "relinquishment" and "disposal of property" foretells that it will be engaging in a quantification inquiry proper to the McCarran Amendment proceedings. With all due respect, the line between the Administrative Procedure Act issues and the McCarran issues, in light of plaintiffs' allegations and prayers for relief, is illusory.
The water court, not the United States District Court, is in the preferred position-according to explicit congressional policy-to examine the factual basis underlying the United States' motion to amend and administration agreement. The litigation before the federal court clearly is only a piece of a complex interrelated puzzle of the type Congress envisioned in adopting the McCarran Amendment for state court determination of rights to the use of water from the same stream system.
Third, the law favors settlements in these complex proceedings by state and federal parties owning rights to waters of the same stream. Across the United States, complex stream adjudications are underway to determine federal and state-law based claims of federal, state, and local governmental agencies and private parties. For example, Idaho's Snake River adjudication addresses 185,-000 claims for water rights. See John E. Thorson, "State Watershed Adjudications: Approaches and Alternatives," in 42 Rocky Mt. Min. L. Inst. § 22.05(8) (1996).
Settlement and accommodation of multiple interests can often promote both environmental and water user interests. The setting of quantification amounts in an implied reserved water rights case is not an exact science. Expensive and conflicting expert testimony is often necessary. The legal standard operable at trial allows quantification of only the minimum amount of water necessary to carry out the purposes of the federal reservation. See City and County of Denver I, 656 P.2d at 20. "Each time this Court has applied the 'implied-reservation-of-water doe-trine,' it has carefully examined both the asserted water right and the specific purposes for which the land was reserved, and concluded that without the water the purposes of the reservation would be entirely defeated." New Mexico, 438 U.S. at 700, 98 S.Ct. 8012.
All of these considerations, together with the uncertainty and expense of prolonged litigation, promote settlement. "The sue-cessful completion of reserved water rights settlements is probably the brightest achievement associated with western stream adjudication.... The sentiment is strong that these settlements encourage local cooperation, develop more lasting and satisfactory solutions, and avoid the expense and conflict of litigation." Thorson, "State Watershed Adjudications: Approaches and Alternatives" § 22.06(6) at 22-47.
Fourth, I believe the majority, in upholding the water court's stay order, underem-phasizes the harm to the state of Colorado and its water users, and overemphasizes the harm to the plaintiffs. In the context of the McCarran Amendment, a high degree of deference to the water court is not warranted when the effect of the stay is an unascertainable delay in managing and completing the adjudication. There can be no finality until the water court finally determines the quantification and administration issues, and we and the United States Supreme Court have had the opportunity to hear any resulting *1086 appeals. With the stay order in effect, the water court apparently cannot proceed until the federal piece of litigation is concluded, and the bulk of water rights holders on the Gunnison River remain insecure in the viability of their uses.
1 R
In consideration of the strong congressional policy expressed in the McCarran Amend'ment, I conclude that the water court abused its discretion in granting the stay in this case. We should be ordering the water court to proceed with determination of all matters involving the quantification and administration of the Black Canyon of the Gunnison implied reserved water right.
I am authorized to state that Justice KOURLIS joins in this dissent.

. In Crystal Creek, we stated that:
Congress approved the construction and operation of several dams and reservoirs, including the Aspinall Unit, for the nonexclusive purposes of
regulating the flow of the Colorado River, storing water for beneficial consumptive use, making it possible for the States of the Upper Basin to utilize, consistently with the provisions of the Colorado River Compact, the apportionments made to and among them in the Colorado River Compact and the Upper Colorado River Basin Compact, respectively, providing for the reclamation of arid and semiarid lands, for the control of floods, and for the generation of hydroelectric power, as an incident of the foregoing purposes.
*1084 Congress also stated that it did not intend for [the Colorado River Storage Project Act, CRSPA] to impede the Upper Basin's development of the water apportioned to it by the Compact.
We agree that the CRSPA reservoirs are part of a plan to allow Colorado to develop and preserve Compact apportionment. However, we find that the stored water provides Colorado with an ability to satisfy the Compact delivery mandates without eroding other rights decreed to beneficial use in the state.
14 P.3d at 334 (internal citations omitted).

. In regards to the subordination of rights, we found:
the in-basin 60,000 acre-foot subordination by the United States is valid. The construction of the Aspinall Unit greatly benefited the Gunni-son River Basin, but not without adverse effects. The dams inundated many miles of prime trout fishing and flooded several properties. To offset these losses, the United States agreed to set aside 60,000 acre-feet of water for future projects to benefit the Upper Gunni-son River Basin. The United States intended that the future projects would develop water resources for use within the Upper Gunnison River Basin.
Crystal Creek, 14 P.3d at 341.